## RUTAN ET AL. *v.* REPUBLICAN PARTY OF ILLINOIS ET AL.

No. 88–1872.   Argued January 16, 1990—Decided June 21, 1990*

---

*Together with No. 88–2074, *Frech et al.* v. *Rutan et al.*, also on certiorari to the same court.

BRENNAN, J., delivered the opinion of the Court, in which WHITE, MAR-SHALL, BLACKMUN, and STEVENS, JJ., joined. STEVENS, J., filed a concurring opinion, *post*, p. 79. SCALIA, J., filed a dissenting opinion, in which REHNQUIST, C. J., and KENNEDY, J., joined, and in which O'CONNOR, J., joined as to Parts II and III, *post*, p. 92.

*Mary Lee Leahy* argued the cause for petitioners in No. 88–1872 and respondents in No. 88–2074. With her on the briefs were *Michael R. Berz, Cheryl R. Jansen,* and *Kathryn E. Eisenhart.*

*Thomas P. Sullivan* argued the cause for respondents in No. 88–1872 and petitioners in No. 88–2074. With him on the briefs were *Jeffrey D. Colman, Michael J. Hayes,* and *Roger P. Flahaven.*†

JUSTICE BRENNAN delivered the opinion of the Court.

To the victor belong only those spoils that may be constitutionally obtained. *Elrod* v. *Burns,* 427 U. S. 347 (1976), and *Branti* v. *Finkel,* 445 U. S. 507 (1980), decided that the First Amendment forbids government officials to discharge or threaten to discharge public employees solely for not being supporters of the political party in power, unless party affiliation is an appropriate requirement for the position involved.

---

†Briefs of *amici curiae* urging reversal in both cases were filed for the American Federation of Labor and Congress of Industrial Organizations by *George Kaufmann* and *Laurence Gold;* and for the North Carolina Professional Fire Fighters Association by *J. Michael McGuinness. C. Richard Johnson* filed a brief for the Independent Voters of Illinois-Independent Precinct Organization et al. as *amici curiae* urging reversal in No. 88–1872. *Robert H. Chanin* and *Jeremiah A. Collins* filed a brief for the National Education Association as *amicus curiae* urging reversal in No. 88–1872 and affirmance in No. 88–2074.

*Hector Rivera Cruz,* Secretary of Justice of Puerto Rico, *Jorge E. Perez Diaz,* Solicitor General, and *Lino J. Saldaña* filed a brief for the Commonwealth of Puerto Rico as *amicus curiae* urging affirmance in both cases.

Today we are asked to decide the constitutionality of several related political patronage practices—whether promotion, transfer, recall, and hiring decisions involving low-level public employees may be constitutionally based on party affiliation and support. We hold that they may not.

## I

The petition and cross-petition before us arise from a lawsuit protesting certain employment policies and practices instituted by Governor James Thompson of Illinois.[1] On November 12, 1980, the Governor issued an executive order proclaiming a hiring freeze for every agency, bureau, board, or commission subject to his control. The order prohibits state officials from hiring any employee, filling any vacancy, creating any new position, or taking any similar action. It affects approximately 60,000 state positions. More than 5,000 of these become available each year as a result of resignations, retirements, deaths, expansions, and reorganizations. The order proclaims that "*no* exceptions" are permitted without the Governor's "express permission after submission of appropriate requests to [his] office." Governor's Executive Order No. 5 (Nov. 12, 1980), Brief for Petitioners and Cross-Respondents 11 (emphasis added).

---

[1] The cases come to us in a preliminary posture, and the question is limited to whether the allegations of petitioners Rutan et al. state a cognizable First Amendment claim sufficient to withstand respondents' motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). Therefore, for purposes of our review we must assume that petitioners' well-pleaded allegations are true. *Berkovitz* v. *United States*, 486 U. S. 531, 540 (1988).

Three of the five original plaintiffs who brought the lawsuit—Rutan, Taylor, and Moore—are petitioners in No. 88–1872, and we refer to them as "petitioners." The defendants in the lawsuit are various Illinois and Republican Party officials. We refer to them as "respondents" because they are the respondents in No. 88–1872. They are also the cross-petitioners in No. 88–2074. Four of the five original plaintiffs—Rutan, Taylor, Standefer, and O'Brien—are named as cross-respondents in No. 88–2074.

Requests for the Governor's "express permission" have allegedly become routine. Permission has been granted or withheld through an agency expressly created for this purpose, the Governor's Office of Personnel (Governor's Office). Agencies have been screening applicants under Illinois' civil service system, making their personnel choices, and submitting them as requests to be approved or disapproved by the Governor's Office. Among the employment decisions for which approvals have been required are new hires, promotions, transfers, and recalls after layoffs.

By means of the freeze, according to petitioners and cross-respondents, the Governor has been using the Governor's Office to operate a political patronage system to limit state employment and beneficial employment-related decisions to those who are supported by the Republican Party. In reviewing an agency's request that a particular applicant be approved for a particular position, the Governor's Office has looked at whether the applicant voted in Republican primaries in past election years, whether the applicant has provided financial or other support to the Republican Party and its candidates, whether the applicant has promised to join and work for the Republican Party in the future, and whether the applicant has the support of Republican Party officials at state or local levels.

Five people (including the three petitioners) brought suit against various Illinois and Republican Party officials in the United States District Court for the Central District of Illinois.[2] They alleged that they had suffered discrimination with respect to state employment because they had not been supporters of the State's Republican Party and that this discrimination violates the First Amendment. Cynthia B.

---

[2] The five originally brought this action both individually and on behalf of those similarly situated. The Seventh Circuit, noting that the District Court had failed to address the class-action questions, reviewed the case as one brought by individuals only. 868 F. 2d 943, 947 (1989). We therefore have only the claims of the individuals before us.

Rutan has been working for the State since 1974 as a rehabilitation counselor. She claims that since 1981 she has been repeatedly denied promotions to supervisory positions for which she was qualified because she had not worked for or supported the Republican Party. Franklin Taylor, who operates road equipment for the Illinois Department of Transportation, claims that he was denied a promotion in 1983 because he did not have the support of the local Republican Party. Taylor also maintains that he was denied a transfer to an office nearer to his home because of opposition from the Republican Party chairmen in the counties in which he worked and to which he requested a transfer. James W. Moore claims that he has been repeatedly denied state employment as a prison guard because he did not have the support of Republican Party officials.

The two other plaintiffs, before the Court as cross-respondents, allege that they were not recalled after layoffs because they lacked Republican credentials. Ricky Standefer was a state garage worker who claims that he was not recalled, although his fellow employees were, because he had voted in a Democratic primary and did not have the support of the Republican Party. Dan O'Brien, formerly a dietary manager with the mental health department, contends that he was not recalled after a layoff because of his party affiliation and that he later obtained a lower paying position with the corrections department only after receiving support from the chairman of the local Republican Party.

The District Court dismissed the complaint with prejudice, under Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim upon which relief could be granted. 641 F. Supp. 249 (1986). The United States Court of Appeals for the Seventh Circuit initially issued a panel opinion, 848 F. 2d 1396 (1988), but then reheard the appeal en banc. The court affirmed the District Court's decision in part and reversed in part. 868 F. 2d 943 (1989). Noting that this Court had previously determined that the patronage practice of discharg-

ing public employees on the basis of their political affiliation violates the First Amendment, the Court of Appeals held that other patronage practices violate the First Amendment only when they are the "substantial equivalent of a dismissal." *Id.*, at 955. The court explained that an employment decision is equivalent to a dismissal when it is one that would lead a reasonable person to resign. *Ibid.* The court affirmed the dismissal of Moore's claim because it found that basing hiring decisions on political affiliation does not violate the First Amendment, but remanded the remaining claims for further proceedings.[3]

Rutan, Taylor, and Moore petitioned this Court to review the constitutional standard set forth by the Seventh Circuit and the dismissal of Moore's claim. Respondents cross-petitioned this Court, contending that the Seventh Circuit's remand of four of the five claims was improper because the employment decisions alleged here do not, as a matter of law, violate the First Amendment. We granted certiorari, 493 U. S. 807 (1989), to decide the important question whether the First Amendment's proscription of patronage dismissals recognized in *Elrod* v. *Burns*, 427 U. S. 347 (1976), and *Branti* v. *Finkel*, 445 U. S. 507 (1980), extends to promotion, transfer, recall, or hiring decisions involving public employment positions for which party affiliation is not an appropriate requirement.

## II

## A

In *Elrod*, *supra*, we decided that a newly elected Democratic sheriff could not constitutionally engage in the patronage practice of replacing certain office staff with members of

---

[3] The Seventh Circuit explained that Standefer's and O'Brien's claims might be cognizable if there were a formal or informal system of rehiring employees in their positions, 868 F. 2d, at 956–957, but expressed considerable doubt that Rutan and Taylor would be able to show that they suffered the "substantial equivalent of a dismissal" by being denied promotions and a transfer. *Id.*, at 955–956.

his own party "when the existing employees lack or fail to obtain requisite support from, or fail to affiliate with, that party." *Id.*, at 351, 373 (plurality opinion), and 375 (Stewart, J., joined by BLACKMUN, J., concurring in judgment). The plurality explained that conditioning public employment on the provision of support for the favored political party "unquestionably inhibits protected belief and association." *Id.*, at 359. It reasoned that conditioning employment on political activity pressures employees to pledge political allegiance to a party with which they prefer not to associate, to work for the election of political candidates they do not support, and to contribute money to be used to further policies with which they do not agree. The latter, the plurality noted, had been recognized by this Court as "tantamount to coerced belief." *Id.*, at 355 (citing *Buckley* v. *Valeo*, 424 U. S. 1, 19 (1976)). At the same time, employees are constrained from joining, working for, or contributing to the political party and candidates of their own choice. *Elrod, supra*, at 355–356. "[P]olitical belief and association constitute the core of those activities protected by the First Amendment," the plurality emphasized. 427 U. S., at 356. Both the plurality and the concurrence drew support from *Perry* v. *Sindermann*, 408 U. S. 593 (1972), in which this Court held that the State's refusal to renew a teacher's contract because he had been publicly critical of its policies imposed an unconstitutional condition on the receipt of a public benefit. See *Elrod, supra*, at 359 (plurality opinion) and 375 (Stewart, J., concurring in judgment); see also *Branti, supra*, at 514–516.

The Court then decided that the government interests generally asserted in support of patronage fail to justify this burden on First Amendment rights because patronage dismissals are not the least restrictive means for fostering those interests. See *Elrod, supra*, at 372–373 (plurality opinion) and 375 (Stewart, J., concurring in judgment). The plurality acknowledged that a government has a significant interest in ensuring that it has effective and efficient employees. It ex-

pressed doubt, however, that "mere difference of political persuasion motivates poor performance" and concluded that, in any case, the government can ensure employee effectiveness and efficiency through the less drastic means of discharging staff members whose work is inadequate. 427 U. S., at 365–366. The plurality also found that a government can meet its need for politically loyal employees to implement its policies by the less intrusive measure of dismissing, on political grounds, only those employees in policy-making positions. *Id.*, at 367. Finally, although the plurality recognized that preservation of the democratic process "may in some instances justify limitations on First Amendment freedoms," it concluded that the "process functions as well without the practice, perhaps even better." Patronage, it explained, "can result in the entrenchment of one or a few parties to the exclusion of others" and "is a very effective impediment to the associational and speech freedoms which are essential to a meaningful system of democratic government." *Id.*, at 368–370.[4]

---

[4] JUSTICE SCALIA's lengthy discussion of the appropriate standard of review for restrictions the government places on the constitutionally protected activities of its employees to ensure efficient and effective operations, see *post*, at 94–102, is not only questionable, it offers no support for his conclusion that patronage practices pass muster under the First Amendment. The interests that JUSTICE SCALIA regards as potentially furthered by patronage practices are not interests that the government has in its capacity as an employer. JUSTICE SCALIA describes the possible benefits of patronage as follows: "patronage stabilizes political parties and prevents excessive political fragmentation," *post*, at 104; patronage is necessary to strong, disciplined party organizations, *post*, at 104–105; patronage "fosters the two-party system," *post*, at 106; and patronage is "a powerful means of achieving the social and political integration of excluded groups," *post*, at 108. These are interests the government might have in the structure and functioning of society as a whole. That the government attempts to use public employment to further such interests does not render those interests employment related. Therefore, even were JUSTICE SCALIA correct that less-than-strict scrutiny is appropriate when the government takes measures to ensure the proper functioning of its internal op-

Four years later, in *Branti, supra,* we decided that the First Amendment prohibited a newly appointed public defender, who was a Democrat, from discharging assistant public defenders because they did not have the support of the Democratic Party. The Court rejected an attempt to distinguish the case from *Elrod,* deciding that it was immaterial whether the public defender had attempted to coerce employees to change political parties or had only dismissed them on the basis of their private political beliefs. We explained that conditioning continued public employment on an employee's having obtained support from a particular political party violates the First Amendment because of "the coercion of belief that necessarily flows from the knowledge that one must have a sponsor in the dominant party in order to retain one's job." 445 U. S., at 516. "In sum," we said, "there is no requirement that dismissed employees prove that they, or other employees, have been coerced into changing, either actually or ostensibly, their political allegiance." *Id.,* at 517. To prevail, we concluded, public employees need show only that they were discharged because they were not affiliated with or sponsored by the Democratic Party. *Ibid.*[5]

## B

We first address the claims of the four current or former employees. Respondents urge us to view *Elrod* and *Branti*

---

erations, such a rule has no relevance to the restrictions on freedom of association and speech at issue in these cases.

[5] *Branti* v. *Finkel,* 445 U. S. 507 (1980), also refined the exception created by *Elrod* v. *Burns,* 427 U. S. 347 (1976), for certain employees. In *Elrod,* we suggested that policymaking and confidential employees probably could be dismissed on the basis of their political views. *Id.,* at 367 (plurality opinion) and 375 (Stewart, J., concurring in judgment). In *Branti,* we said that a State demonstrates a compelling interest in infringing First Amendment rights only when it can show that "party affiliation is an appropriate requirement for the effective performance of the public office involved." *Branti, supra,* at 518. The scope of this exception does not concern us here as respondents concede that the five employees who brought this suit are not within it.

as inapplicable because the patronage dismissals at issue in those cases are different in kind from failure to promote, failure to transfer, and failure to recall after layoff. Respondents initially contend that the employee petitioners' and cross-respondents' First Amendment rights have not been infringed because they have no entitlement to promotion, transfer, or rehire. We rejected just such an argument in *Elrod*, 427 U. S., at 359–360 (plurality opinion) and 375 (Stewart, J., concurring in judgment), and *Branti*, 445 U. S., at 514–515, as both cases involved state workers who were employees at will with no legal entitlement to continued employment. In *Perry*, 408 U. S., at 596–598, we held explicitly that the plaintiff teacher's lack of a contractual or tenure right to re-employment was immaterial to his First Amendment claim. We explained the viability of his First Amendment claim as follows:

> "For at least a quarter-century, this Court has made clear that even though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, *there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech.* For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited. This would allow the government to 'produce a result which [it] could not command directly.' *Speiser* v. *Randall*, 357 U. S. 513, 526 [(1958)]. Such interference with constitutional rights is impermissible." *Id.*, at 597 (emphasis added).

Likewise, we find the assertion here that the employee petitioners and cross-respondents had no legal entitlement to promotion, transfer, or recall beside the point.

Respondents next argue that the employment decisions at issue here do not violate the First Amendment because the decisions are not punitive, do not in any way adversely affect the terms of employment, and therefore do not chill the exercise of protected belief and association by public employees.[6] This is not credible. Employees who find themselves in dead-end positions due to their political backgrounds *are* adversely affected. They will feel a significant obligation to support political positions held by their superiors, and to refrain from acting on the political views they actually hold, in order to progress up the career ladder. Employees denied transfers to workplaces reasonably close to their homes until they join and work for the Republican Party will feel a daily pressure from their long commutes to do so. And employees who have been laid off may well feel compelled to engage in whatever political activity is necessary to regain regular paychecks and positions corresponding to their skill and experience.[7]

---

[6] Respondents' reliance on *Johnson* v. *Transportation Agency, Santa Clara County*, 480 U. S. 616 (1987), to this effect is misplaced. The question in *Johnson* was whether the Santa Clara County affirmative-action program violated the antidiscrimination requirement of Title VII of the Civil Rights Act of 1964. In that context, we said that the denial of a promotion did not unsettle any legitimate, firmly rooted expectations. We did not dispute, however, that it placed a burden on the person to whom the promotion was denied. We considered Johnson's expectations in discussing whether the plan unnecessarily trammeled the rights of male employees —*i. e.*, whether its goal was pursued with an excessive, rather than reasonable, amount of dislocation. Our decision that promotion denials are not such an imposition that Title VII prevented Santa Clara from considering gender in order to redress past discrimination does not mean that promotion denials are not enough of an imposition to pressure employees to affiliate with the favored party.

[7] The complaint in this case states that Dan O'Brien was driven to do exactly this. After being rejected for recall by the Governor's Office, he allegedly pursued the support of a Republican Party official, despite his previous interest in the Democratic Party.

The same First Amendment concerns that underlay our decisions in *Elrod, supra,* and *Branti, supra,* are implicated here. Employees who do not compromise their beliefs stand to lose the considerable increases in pay and job satisfaction attendant to promotions, the hours and maintenance expenses that are consumed by long daily commutes, and even their jobs if they are not rehired after a "temporary" layoff. These are significant penalties and are imposed for the exercise of rights guaranteed by the First Amendment. Unless these patronage practices are narrowly tailored to further vital government interests, we must conclude that they impermissibly encroach on First Amendment freedoms. See *Elrod, supra,* at 362–363 (plurality opinion) and 375 (Stewart, J., concurring in judgment); *Branti, supra,* at 515–516.

We find, however, that our conclusions in *Elrod, supra,* and *Branti, supra,* are equally applicable to the patronage practices at issue here. A government's interest in securing effective employees can be met by discharging, demoting, or transferring staff members whose work is deficient. A government's interest in securing employees who will loyally implement its policies can be adequately served by choosing or dismissing certain high-level employees on the basis of their political views. See *Elrod, supra,* at 365–368 (plurality opinion); *Branti, supra,* at 518, and 520, n. 14. Likewise, the "preservation of the democratic process" is no more furthered by the patronage promotions, transfers, and rehires at issue here than it is by patronage dismissals. First, "political parties are nurtured by other, less intrusive and equally effective methods." *Elrod, supra,* at 372–373 (plurality opinion). Political parties have already survived the substantial decline in patronage employment practices in this century. See *Elrod, supra,* at 369, and n. 23 (plurality opinion); see also L. Sabato, Goodbye to Good-time Charlie 67 (2d ed. 1983) ("The number of patronage positions has significantly decreased in virtually every state"); Congressional Quarterly Inc., State Govern-

ment, CQ's Guide to Current Issues and Activities 134 (T. Beyle ed. 1989–1990) ("Linkage[s] between political parties and government office-holding . . . have died out under the pressures of varying forces [including] the declining influence of election workers when compared to media and money-intensive campaigning, such as the distribution of form letters and advertising"); Sorauf, Patronage and Party, 3 Midwest J. Pol. Sci. 115, 118–120 (1959) (many state and local parties have thrived without a patronage system). Second, patronage decidedly impairs the elective process by discouraging free political expression by public employees. See *Elrod*, 427 U. S., at 372 (plurality opinion) (explaining that the proper functioning of a democratic system "is indispensably dependent on the unfettered judgment of each citizen on matters of political concern"). Respondents, who include the Governor of Illinois and other state officials, do not suggest any other overriding government interest in favoring Republican Party supporters for promotion, transfer, and rehire.

We therefore determine that promotions, transfers, and recalls after layoffs based on political affiliation or support are an impermissible infringement on the First Amendment rights of public employees. In doing so, we reject the Seventh Circuit's view of the appropriate constitutional standard by which to measure alleged patronage practices in government employment. The Seventh Circuit proposed that only those employment decisions that are the "substantial equivalent of a dismissal" violate a public employee's rights under the First Amendment. 868 F. 2d, at 954–957. We find this test unduly restrictive because it fails to recognize that there are deprivations less harsh than dismissal that nevertheless press state employees and applicants to conform their beliefs and associations to some state-selected orthodoxy. See *Elrod, supra*, at 356–357 (plurality opinion); *West Virginia Bd. of Education* v. *Barnette*, 319 U. S. 624, 642 (1943).[8]

---

[8]The Seventh Circuit's proffered test was not based on that court's determination that other patronage practices do not burden the free exer-

The First Amendment is not a tenure provision, protecting public employees from actual or constructive discharge. The First Amendment prevents the government, except in the most compelling circumstances, from wielding its power to interfere with its employees' freedom to believe and associate, or to not believe and not associate.

Whether the four employees were in fact denied promotions, transfers, or rehires for failure to affiliate with and support the Republican Party is for the District Court to decide in the first instance. What we decide today is that such denials are irreconcilable with the Constitution and that the allegations of the four employees state claims under 42 U. S. C. § 1983 (1982 ed.) for violations of the First and Fourteenth Amendments. Therefore, although we affirm the Seventh Circuit's judgment to reverse the District Court's dismissal of these claims and remand them for further proceedings, we do not adopt the Seventh Circuit's reasoning.

## C

Petitioner James W. Moore presents the closely related question whether patronage hiring violates the First Amend-

---

cise of First Amendment rights. Rather, the court chose to defer to the political process in an area in which it felt this Court had not yet spoken clearly. 868 F. 2d, at 953–954. The court also expressed concern that the opposite conclusion would open state employment to excessive interference by the Federal Judiciary. *Ibid.* We respect but do not share this concern.

Our decision does not impose the Federal Judiciary's supervision on any state government activity that is otherwise immune. The federal courts have long been available for protesting unlawful state employment decisions. Under Title VII, 42 U. S. C. §§ 2000e(a), (f), and 2000e–2(a) (1982 ed.), it is a violation of federal law to discriminate in any way in state employment (excepting certain high-level positions) on the basis of race, color, religion, sex, or national origin. Moreover, the First Amendment, as the court below noted, already protects state employees not only from patronage dismissals but also from "even an act of retaliation as trivial as failing to hold a birthday party for a public employee . . . when intended to punish her for exercising her free speech rights." 868 F. 2d, at 954, n. 4.

ment. Patronage hiring places burdens on free speech and association similar to those imposed by the patronage practices discussed above. A state job is valuable. Like most employment, it provides regular paychecks, health insurance, and other benefits. In addition, there may be openings with the State when business in the private sector is slow. There are also occupations for which the government is a major (or the only) source of employment, such as social workers, elementary school teachers, and prison guards. Thus, denial of a state job is a serious privation.

Nonetheless, respondents contend that the burden imposed is not of constitutional magnitude.[9] Decades of decisions by this Court belie such a claim. We premised *Torcaso* v. *Watkins*, 367 U. S. 488 (1961), on our understanding that loss of a job opportunity for failure to compromise one's convictions states a constitutional claim. We held that Maryland could not refuse an appointee a commission for the position of notary public on the ground that he refused to declare his belief in God, because the required oath "unconstitutionally invades the appellant's freedom of belief and religion." *Id.*, at 496. In *Keyishian* v. *Board of Regents of Univ. of New York*, 385 U. S. 589, 609–610 (1967), we held a law affecting appointment and retention of teachers invalid because it premised employment on an unconstitutional restriction of political belief and association. In *Elfbrandt* v. *Russell*, 384 U. S. 11, 19 (1966), we struck down a loyalty oath which was a prerequisite for public employment.

Almost half a century ago, this Court made clear that the government "may not enact a regulation providing that no Republican . . . shall be appointed to federal office." *Public Workers* v. *Mitchell*, 330 U. S. 75, 100 (1947). What the

---

[9]To the extent that respondents also argue that Moore has not been penalized for the exercise of protected speech and association rights because he had no claim of right to employment in the first place, that argument is foreclosed by *Perry* v. *Sindermann*, 408 U. S. 593, 597 (1972). See *supra*, at 72.

First Amendment precludes the government from commanding directly, it also precludes the government from accomplishing indirectly. See *Perry*, 408 U. S., at 597 (citing *Speiser* v. *Randall*, 357 U. S. 513, 526 (1958)); see *supra*, at 72. Under our sustained precedent, conditioning hiring decisions on political belief and association plainly constitutes an unconstitutional condition, unless the government has a vital interest in doing so. See *Elrod*, 427 U. S., at 362–363 (plurality opinion) and 375 (Stewart, J., concurring in judgment); *Branti*, 445 U. S., at 515–516; see also *Sherbert* v. *Verner*, 374 U. S. 398 (1963) (unemployment benefits); *Speiser* v. *Randall*, *supra* (tax exemption). We find no such government interest here, for the same reasons that we found that the government lacks justification for patronage promotions, transfers, or recalls. See *supra*, at 71–76.

The court below, having decided that the appropriate inquiry in patronage cases is whether the employment decision at issue is the substantial equivalent of a dismissal, affirmed the trial court's dismissal of Moore's claim. See 868 F. 2d, at 954. The Court of Appeals reasoned that "rejecting an employment application does not impose a hardship upon an employee comparable to the loss of [a] job." *Ibid.*, citing *Wygant* v. *Jackson Bd. of Education*, 476 U. S. 267 (1986) (plurality opinion). Just as we reject the Seventh Circuit's proffered test, see *supra*, at 75–76, we find the Seventh Circuit's reliance on *Wygant* to distinguish hiring from dismissal unavailing. The court cited a passage from the plurality opinion in *Wygant* explaining that school boards attempting to redress past discrimination must choose methods that broadly distribute the disadvantages imposed by affirmative-action plans among innocent parties. The plurality said that race-based layoffs placed too great a burden on individual members of the nonminority race, but suggested that discriminatory hiring was permissible, under certain circumstances, even though it burdened white applicants, because the burden was less intrusive than the loss of an existing job.

476 U. S., at 282–284.   See also *id.*, at 294–295 (WHITE, J., concurring in judgment).

*Wygant* has no application to the question at issue here. The plurality's concern in that case was identifying the least harsh means of remedying past wrongs.   It did not question that *some* remedy was permissible when there was sufficient evidence of past discrimination.   In contrast, the Governor of Illinois has not instituted a remedial undertaking.   It is unnecessary here to consider whether not being hired is less burdensome than being discharged, because the government is not pressed to do *either* on the basis of political affiliation. The question in the patronage context is not which penalty is more acute but whether the government, without sufficient justification, is pressuring employees to discontinue the free exercise of their First Amendment rights.

If Moore's employment application was set aside because he chose not to support the Republican Party, as he asserts, then Moore's First Amendment rights have been violated. Therefore, we find that Moore's complaint was improperly dismissed.

## III

We hold that the rule of *Elrod* and *Branti* extends to promotion, transfer, recall, and hiring decisions based on party affiliation and support and that all of the petitioners and cross-respondents have stated claims upon which relief may be granted.   We affirm the Seventh Circuit insofar as it remanded Rutan's, Taylor's, Standefer's, and O'Brien's claims. However, we reverse the Seventh Circuit's decision to uphold the dismissal of Moore's claim.   All five claims are remanded for proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE STEVENS, concurring.

While I join the Court's opinion, these additional comments are prompted by three propositions advanced by JUSTICE SCALIA in his dissent.   First, he implies that prohibiting im-

position of an unconstitutional condition upon eligibility for government employment amounts to adoption of a civil service system. Second, he makes the startling assertion that a long history of open and widespread use of patronage practices immunizes them from constitutional scrutiny. Third, he assumes that the decisions in *Elrod* v. *Burns*, 427 U. S. 347 (1976), and *Branti* v. *Finkel*, 445 U. S. 507 (1980), represented dramatic departures from prior precedent.

Several years before either *Elrod* or *Branti* was decided, I had occasion as a judge on the Court of Appeals for the Seventh Circuit to evaluate each of these propositions. *Illinois State Employees Union, Council 34, Am. Federation of State, Cty., and Municipal Employees, AFL–CIO* v. *Lewis*, 473 F. 2d 561 (1972), cert. denied, 410 U. S. 928 (1973). With respect to the first, I wrote:

> "Neither this court nor any other may impose a civil service system upon the State of Illinois. The General Assembly has provided an elaborate system regulating the appointment to specified positions solely on the basis of merit and fitness, the grounds for termination of such employment, and the procedures which must be followed in connection with hiring, firing, promotion, and retirement. A federal court has no power to establish any such employment code.
>
> "However, recognition of plaintiffs' claims will not give every public employee civil service tenure and will not require the state to follow any set procedure or to assume the burden of explaining or proving the grounds for every termination. It is the former employee who has the burden of proving that his discharge was motivated by an impermissible consideration. It is true, of course, that a prima facie case may impose a burden of explanation on the State. But the burden of proof will remain with the plaintiff employee and we must assume that the trier of fact will be able to differentiate between those discharges which are politically motivated and

those which are not. There is a clear distinction between the grant of tenure to an employee—a right which cannot be conferred by judicial fiat—and the prohibition of a discharge for a particular impermissible reason. The Supreme Court has plainly identified that distinction on many occasions, most recently in Perry v. Sindermann, 408 U. S. 593 (1972).

"Unlike a civil service system, the Fourteenth Amendment to the Constitution does not provide job security, as such, to public employees. If, however, a discharge is motivated by considerations of race, religion, or punishment of constitutionally protected conduct, it is well settled that the State's action is subject to federal judicial review. There is no merit to the argument that recognition of plaintiffs' constitutional claim would be tantamount to foisting a civil service code upon the State." 473 F. 2d, at 567–568 (footnotes and citations omitted).

Denying the Governor of Illinois the power to require every state employee, and every applicant for state employment, to pledge allegiance and service to the political party in power is a far cry from a civil service code. The question in this case is simply whether a Governor may adopt a rule that would be plainly unconstitutional if enacted by the General Assembly of Illinois.[1]

Second, JUSTICE SCALIA asserts that "when a practice not expressly prohibited by the text of the Bill of Rights bears the endorsement of a long tradition of open, widespread, and unchallenged use that dates back to the beginning of the Republic, we have no proper basis for striking it down." Post, at 95; post, at 102 (a "clear and continuing tradition of our peo-

---

[1] Despite JUSTICE SCALIA's imprecise use of the term, post, at 114, the legal issue presented in this litigation is plainly not a "political question." See Elrod v. Burns, 427 U. S. 347, 351–353 (1976) (plurality opinion); Illinois State Employees Union, Council 34, Am. Federation of State, Cty., and Municipal Employees, AFL–CIO v. Lewis, 473 F. 2d 561, 566–567 (1972), cert. denied, 410 U. S. 928 (1973).

ple" deserves *"dispositive* effect"). The argument that traditional practices are immune from constitutional scrutiny is advanced in two plurality opinions that JUSTICE SCALIA has authored, but not by any opinion joined by a majority of the Members of the Court.[2]

In the *Lewis* case, I noted the obvious response to this position: "[I]f the age of a pernicious practice were a sufficient reason for its continued acceptance, the constitutional attack on racial discrimination would, of course, have been doomed to failure." 473 F. 2d, at 568, n. 14. See, *e. g., Brown* v. *Board of Education,* 347 U. S. 483 (1954).[3] I then added

---

[2] See *Michael H.* v. *Gerald D.,* 491 U. S. 110 (1989) (plurality opinion); *Burnham* v. *Superior Court of California, Marin County,* 495 U. S. 604 (1990) (plurality opinion). JUSTICE SCALIA's additional reliance on *Bowers* v. *Hardwick,* 478 U. S. 186 (1986), *post,* at 103, is misplaced because in that case the Court used a history of state criminal prohibitions to support its refusal to extend the doctrine of substantive due process to previously unprotected conduct. The question in these cases is whether mere longevity can immunize from constitutional review state conduct that would otherwise violate the First Amendment.

[3] Ironically, at the time of the adoption of the Bill of Rights, the party system itself was far from an "accepted political nor[m]." *Post,* at 95. Our founders viewed it as a pathology:

"Political discussion in eighteenth-century England and America was pervaded by a kind of anti-party cant. Jonathan Swift, in his *Thoughts on Various Subjects,* had said that 'Party is the madness of many, for the gain of the few.' This maxim, which was repeated on this side of the Atlantic by men like John Adams and William Paterson, plainly struck a deep resonance in the American mind. Madison and Hamilton, when they discussed parties or factions (for them the terms were usually interchangeable) in *The Federalist,* did so only to arraign their bad effects. In the great debate over the adoption of the Constitution both sides spoke ill of parties. The popular sage, Franklin (who was not always consistent on the subject), gave an eloquent warning against factions and 'the infinite mutual abuse of parties, tearing to pieces the best of characters.' George Washington devoted a large part of his political testament, the Farewell Address, to stern warnings against 'the baneful effects of the Spirit of Party.' His successor, John Adams, believed that 'a division of the republic into two great parties . . . . is to be dreaded as the greatest political evil under our Constitution.' Similar admonitions can be found in the writings of the arch-

this comment on the specific application of that argument to patronage practices:

"Finally, our answer to the constitutional question is not foreclosed by the fact that the 'spoils system has been entrenched in American history for almost two hundred years.' Alomar v. Dwyer, 447 F. 2d 482, 483 (2d Cir. 1971). For most of that period it was assumed, without serious question or debate, that since a public employee has no constitutional right to his job, there can be no valid constitutional objection to his summary removal. See Bailey v. Richardson, 86 U. S. App. D. C. 248, 182 F. 2d 46, 59 (1950), affirmed per curiam by an equally divided Court, 341 U. S. 918; Adler v. Board of Education, 342 U. S. 485 [(1952)]. But as Mr. Justice Marshall so forcefully stated in 1965 when he was a circuit judge, 'the theory that public employment which may be denied altogether may be subjected to any conditions, regardless of how unreasonable, has been uniformly rejected.' Keyishian v. Board of Regents, 345 F. 2d 236, 239 (2d Cir. 1965). The development of constitutional law subsequent to the Supreme Court's unequivocal repudiation of the line of cases ending with Bailey v.

Federalist Fisher Adams and the 'philosopher of Jeffersonian democracy,' John Taylor of Caroline. If there was one point of political philosophy upon which these men, who differed on so many things, agreed quite readily, it was their common conviction about the baneful effects of the spirit of party." R. Hofstadter, The Idea of a Party System 2–3 (1969) (footnote omitted).

Our contemporary recognition of a state interest in protecting the two major parties from damaging intraparty feuding or unrestrained factionalism, see, e. g., Storer v. Brown, 415 U. S. 724 (1974); post, at 106–107, has not disturbed our protection of the rights of individual voters and the role of alternative parties in our government. See, e. g., Anderson v. Celebrezze, 460 U. S. 780, 793 (1983) (burdens on new or small parties and independent candidates impinge on associational choices); Williams v. Rhodes, 393 U. S. 23, 32 (1968) (there is "no reason why two parties should retain a permanent monopoly on the right to have people vote for or against them").

Richardson and Adler v. Board of Education is more relevant than the preceding doctrine which is now 'universally rejected.'" 473 F. 2d, at 568 (footnotes and citations omitted).

With respect to JUSTICE SCALIA's view that until *Elrod* v. *Burns* was decided in 1976, it was unthinkable that patronage could be unconstitutional, see *post*, at 96–97, it seems appropriate to point out again not only that my views in *Lewis* antedated *Elrod* by several years, but, more importantly, that they were firmly grounded in several decades of decisions of this Court. As explained in *Lewis:*

"[In 1947] a closely divided Supreme Court upheld a statute prohibiting federal civil service employees from taking an active part in partisan political activities. United Public Workers v. Mitchell, 330 U. S. 75. The dissenting Justices felt that such an abridgment of First Amendment rights could not be justified. The majority, however, concluded that the government's interests in not compromising the quality of public service and in not permitting individual employees to use their public offices to advance partisan causes were sufficient to justify the limitation on their freedom.

"There was no dispute within the Court over the proposition that the employees' interests in political action were protected by the First Amendment. The Justices' different conclusions stemmed from their different appraisals of the sufficiency of the justification for the restriction. That justification—the desirability of political neutrality in the public service and the avoidance of the use of the power and prestige of government to favor one party or the other—would condemn rather than support the alleged conduct of defendant in this case. Thus, in dicta, the Court unequivocally stated that the Legislature could not require allegiance to a particular political faith as a condition of public employment:

" 'Appellants urge that federal employees are protected by the Bill of Rights and that Congress may not "enact a regulation providing that no Republican, Jew or Negro shall be appointed to federal office, or that no federal employee shall attend Mass or take any active part in missionary work." None would deny such limitations on Congressional power but, because there are some limitations it does not follow that a prohibition against acting as ward leader or worker at the polls is invalid.' 330 U. S. 75, 100.

"In 1952 the Court quoted that dicta in support of its holding that the State of Oklahoma could not require its employees to profess their loyalty by denying past association with Communists. Wieman v. Updegraff, 344 U. S. 183, 191–192. That decision did not recognize any special right to public employment; rather, it rested on the impact of the requirement on the citizen's First Amendment rights. We think it unlikely that the Supreme Court would consider these plaintiffs' interest in freely associating with members of the Democratic Party less worthy of protection than the Oklahoma employees' interest in associating with Communists or former Communists.

"In 1961 the Court held that a civilian cook could be summarily excluded from a naval gun factory. Cafeteria and Restaurant Workers Union, Local 473, AFL–CIO v. McElroy, 367 U. S. 886. The government's interest in maintaining the security of the military installation outweighed the cook's interest in working at a particular location. Again, however, the Court explicitly assumed that the sovereign could not deny employment for the reason that the citizen was a member of a particular political party or religious faith—'that she could not have been kept out because she was a Democrat or a Methodist.' 367 U. S. at 898.

"In 1968 the Court held that 'a teacher's exercise of his right to speak on issues of public importance may not furnish the basis for his dismissal from public employment.' Pickering v. Board of Education, 391 U. S. 563, 574. The Court noted that although criminal sanctions 'have a somewhat different impact on the exercise of the right to freedom of speech from dismissal from employment, it is apparent that the threat of dismissal from public employment is nonetheless a potent means of inhibiting speech.' *Ibid.* The holding in *Pickering* was a natural sequel to Mr. Justice Frankfurter's comment in dissent in Shelton v. Tucker that a scheme to terminate the employment of teachers solely because of their membership in unpopular organizations would run afoul of the Fourteenth Amendment. 364 U. S. 479, 496 [(1960)].

"In 1972 the Court reaffirmed the proposition that a nontenured public servant has no constitutional right to public employment, but nevertheless may not be dismissed for exercising his First Amendment rights. Perry v. Sindermann, 408 U. S. 593. The Court's explanation of its holding is pertinent here:

" 'For at least a quarter century, this Court has made clear that even though a person has no "right" to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not act. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests — especially, his interest in freedom of speech. For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited. This would allow the government to "produce a result which [it] could not command directly." Speiser v. Randall, 357 U. S. 513, 526. Such interference with constitutional rights is impermissible.'

" 'We have applied this general principle to denials of tax exemptions, Speiser v. Randall, *supra,* unemployment benefits, Sherbert v. Verner, 374 U. S. 398, 404–405 [(1963)], and welfare payments, Shapiro v. Thompson, 394 U. S. 618, 627 n. 6 [(1969)]; Graham v. Richardson, 403 U. S. 365, 374 [(1971)]. But, most often, we have applied the principle to denials of public employment. United Public Workers v. Mitchell, 330 U. S. 75, 100 [(1947)]; Wieman v. Updegraff, 344 U. S. 183, 192 [(1952)]; Shelton v. Tucker, 364 U. S. 479, 485–486 [(1960)]; Torcaso v. Watkins, 367 U. S. 488, 495–496 [(1961)]; Cafeteria and Restaurant Workers, etc. v. McElroy, 367 U. S. 886, 894 [(1961)]; Cramp v. Board of Public Instruction, 368 U. S. 278, 288 [(1961)]; Baggett v. Bullitt, 377 U. S. 360 [(1964)]; Elfbrandt v. Russell, 384 U. S. [11,] 17 [(1966)]; Keyishian v. Board of Regents, 385 U. S. 589, 605–606 [(1967)]; Whitehill v. Elkins, 389 U. S. 54 [(1967)]; United States v. Robel, 389 U. S. 258 [(1967)]; Pickering v. Board of Education, 391 U. S. 563, 568 [(1968)]. We have applied the principle regardless of the public employee's contractual or other claim to a job. Compare Pickering v. Board of Education, *supra,* with Shelton v. Tucker, *supra.*'

" 'Thus the respondent's lack of a contractual or tenure "right" to reemployment for the 1969–1970 academic year is immaterial to his free speech claim. . . .' 408 U. S. at 597.

"This circuit has given full effect to this principle." 473 F. 2d, at 569–572 (footnotes and citations omitted).

See also *American Federation of State, Cty. and Municipal Employees, AFL–CIO* v. *Shapp,* 443 Pa. 527, 537–545, 280 A. 2d 375, 379–383 (1971) (Barbieri, J., dissenting).

To avoid the force of the line of authority described in the foregoing passage, JUSTICE SCALIA would weigh the supposed general state interest in patronage hiring against the

aggregated interests of the many employees affected by the practice. This defense of patronage obfuscates the critical distinction between partisan interest and the public interest.[4] It assumes that governmental power and public re-

[4] Although JUSTICE SCALIA's defense of patronage turns on the benefits of fostering the two-party system, *post*, at 106–107, his opinion is devoid of reference to meaningful evidence that patronage practices have played a significant role in the preservation of the two-party system. In each of the examples that he cites — "the Boss Tweeds, the Tammany Halls, the Pendergast Machines, the Byrd Machines, and the Daley Machines," *post*, at 93 — patronage practices were used solely to protect the power of an entrenched majority. See Laycock, Notes on the Role of Judicial Review, the Expansion of Federal Power, and the Structure of Constitutional Rights, 99 Yale L. J. 1711, 1722 (1990) (describing the "hopelessness of contesting elections" in Chicago's "one-party system" when "half a dozen employees of the city and of city contractors were paid with public funds to work [a precinct] for the other side"); Johnson, Successful Reform Litigation: The *Shakman* Patronage Case, 64 Chi.-Kent L. Rev. 479, 481 (1988) (the "massive Democratic patronage employment system" maintained a "noncompetitive political system" in Cook County in the 1960's).

Without repeating the Court's studied rejection of the policy arguments for patronage practices in *Elrod*, 427 U. S., at 364–373, I note only that many commentators agree more with JUSTICE SCALIA's admissions of the systemic costs of patronage practices — the "financial corruption, such as salary kickbacks and partisan political activity on government-paid time," the reduced efficiency of government, and the undeniable constraint upon the expression of views by employees, *post*, at 108–110 — than with his belief that patronage is necessary to political stability and integration of powerless groups. See, *e. g.*, G. Pomper, Voters, Elections, and Parties 282–304 (1988) (multiple causes of party decline); D. Price, Bringing Back the Parties 22–25 (1984) (same); Comment, 41 U. Chi. L. Rev. 297, 319–328 (1974) (same); Wolfinger, Why Political Machines Have Not Withered Away and Other Revisionist Thoughts, 34 J. Politics 365, 398 (1972) (absence of machine politics in California); J. James, American Political Parties in Transition 85 (1974) (inefficient and antiparty effects of patronage); Johnston, Patrons and Clients, Jobs and Machines: A Case Study of the Uses of Patronage, 73 Am. Pol. Sci. Rev. 385 (1979) (same); Grimshaw, The Political Economy of Machine Politics, 4 Corruption and Reform 15 (1989) (same); Comment, 49 U. Chi. L. Rev. 181, 197–200 (1982) (same); Freedman, Doing Battle with the Patronage Army: Politics, Courts and

sources — in this case employment opportunities — may appropriately be used to subsidize partisan activities even when the political affiliation of the employee or the job applicant is entirely unrelated to his or her public service.[5]   The premise on which this position rests would justify the use of public funds to compensate party members for their campaign work, or, conversely, a legislative enactment denying public employment to nonmembers of the majority party.   If such legislation is unconstitutional — as it clearly would be — an equally pernicious rule promulgated by the executive must also be invalid.

JUSTICE SCALIA argues that distinguishing "inducement and compulsion" reveals that a patronage system's impairment of the speech and associational rights of employees and would-be employees is insignificant.   *Post*, at 109–110.   This analysis contradicts the harsh reality of party discipline that is the linchpin of his theory of patronage.   *Post*, at 105 (emphasizing the "link between patronage and party discipline, and between that and party success").[6]   More impor-

---

Personnel Administration in Chicago, 48 Pub. Admin. Rev. 847 (1988) (race and machine politics).

Incidentally, although some might suggest that Jacob Arvey was "best known as the promoter of Adlai Stevenson," *post*, at 104, that connection is of interest only because of Mr. Arvey's creative and firm leadership of the powerful political organization that was subsequently led by Richard J. Daley.   M. Tolchin & S. Tolchin, To the Victor 36 (1971).

[5] Neither JUSTICE SCALIA nor any of the parties suggests that party affiliation is relevant to any of the positions at stake in this litigation — rehabilitation counselor, road equipment operator, prison guard, dietary manager, and temporary garage worker.   Reliance on the difficulty of precisely dividing the positions in which political affiliation is relevant to the quality of public service from those in which it is not an appropriate requirement of the job is thus inapposite.   See *post*, at 110–114.   Difficulty in deciding borderline cases does not justify imposition of a loyalty oath in the vast category of positions in which it is irrelevant.

[6] The iron fist inside the velvet glove of JUSTICE SCALIA's "inducements" and "influences" is apparent from his own descriptions of the essen-

tantly, it rests on the long-rejected fallacy that a privilege may be burdened by unconstitutional conditions. See, *e. g.*, *Perry* v. *Sindermann*, 408 U. S. 593, 597 (1972). There are a few jobs for which an individual's race or religion may be relevant, see *Wygant* v. *Jackson Bd. of Education*, 476 U. S. 267, 314–315 (1986) (STEVENS, J., dissenting); there are many jobs for which political affiliation is relevant to the employee's ability to function effectively as part of a given administration. In those cases — in other words, cases in which "the efficiency of the public service," *Public Workers* v. *Mitchell*, 330 U. S. 75, 101 (1947), would be advanced by hiring workers who are loyal to the Governor's party — such hiring is permissible under the holdings in *Elrod* and *Branti*. These cases, however, concern jobs in which race, religion, and political affiliation are all equally and entirely irrelevant to the public service to be performed. When an individual has

---

tial features of a patronage system. See, *e. g.*, *post*, at 109 (the worker may "urge *within the organization* the adoption of any political position; but if that position is rejected he must vote and work for the party nonetheless"); *post*, at 105 (quoting M. Tolchin & S. Tolchin, To the Victor, at 123 (reporting that Montclair, New Jersey, Democrats provide fewer services than Cook County, Illinois, Democrats, while "the rate of issue participation is much higher among Montclair Democrats who are not bound by the fear displayed by the Cook County committeemen")); *post*, at 105 (citing W. Grimshaw, The Political Economy of Machine Politics, 4 Corruption and Reform 15, 30 (1989) (reporting that Mayor Daley "sacked" a black committeeman for briefly withholding support for a school board nominee whom civil rights activists opposed)).

Of course, we have firmly rejected any requirement that aggrieved employees "prove that they, or other employees, have been coerced into changing, either actually or ostensibly, their political allegiance." *Branti*, 445 U. S. 507, 517 (1980). What is at issue in these cases is not whether an employee is actually coerced or merely influenced, but whether the attempt to obtain his or her support through "party discipline" is legitimate. To apply the relevant question to JUSTICE SCALIA's example, *post*, at 109–110, the person who attempts to bribe a public official is guilty of a crime regardless of whether the official submits to temptation; likewise, a political party's attempt to maintain loyalty through allocation of government resources is improper regardless of whether any employee capitulates.

been denied employment for an impermissible reason, it is unacceptable to balance the constitutional rights of the individual against the political interests of the party in power. It seems to me obvious that the government may not discriminate against particular individuals in hopes of advancing partisan interests through the misuse[7] of public funds.

The only systemic consideration permissible in these circumstances is not that of the controlling party, but that of the aggregate of burdened individuals. By impairing individuals' freedoms of belief and association, unfettered patronage practices undermine the "free functioning of the electoral process." *Elrod*, 427 U. S., at 356. As I wrote in 1972:

> "Indeed, when numbers are considered, it is appropriate not merely to consider the rights of a particular janitor who may have been offered a bribe from the public treasury to obtain his political surrender, but also the impact on the body politic as a whole when the free political choice of millions of public servants is inhibited or manipulated by the selective award of public benefits. While the patronage system is defended in the name of democratic tradition, its paternalistic impact on the political

---

[7] I use the term "misuse" deliberately because the entire rationale for patronage hiring as an economic incentive for partisan political activity rests on the assumption that the patronage employee filling a government position must be paid a premium to reward him for his partisan services. Without such a premium, the economic incentive rationale on which JUSTICE SCALIA relies does not exist. It has been clear to Congress and this Court for over a century that refusal to contribute "may lead to putting good men out of the service, liberal payments may be made the ground for keeping poor ones in," and "the government itself may be made to furnish indirectly the money to defray the expenses of keeping the political party in power that happens to have for the time being the control of the public patronage." *Ex parte Curtis*, 106 U. S. 371, 375 (1882) (upholding constitutionality of Act of Aug. 15, 1876, § 6, ch. 287, 19 Stat. 169, prohibiting nonappointed federal employees from requesting or receiving any thing of value for political purposes).

Petitioners Rutan and Taylor both allege that they are more qualified than the persons who were promoted over them.

process is actually at war with the deeper traditions of democracy embodied in the First Amendment." *Lewis,* 473 F. 2d, at 576.[8]

The tradition that is relevant in these cases is the American commitment to examine and reexamine past and present practices against the basic principles embodied in the Constitution. The inspirational command by our President in 1961 is entirely consistent with that tradition: "Ask not what your country can do for you—ask what you can do for your country." These cases involve a contrary command: "Ask not what job applicants can do for the State—ask what they can do for our party." Whatever traditional support may remain for a command of that ilk, it is plainly an illegitimate excuse for the practices rejected by the Court today.

JUSTICE SCALIA, with whom THE CHIEF JUSTICE and JUSTICE KENNEDY join, and with whom JUSTICE O'CONNOR joins as to Parts II and III, dissenting.

Today the Court establishes the constitutional principle that party membership is not a permissible factor in the dispensation of government jobs, except those jobs for the performance of which party affiliation is an "appropriate requirement." *Ante,* at 64. It is hard to say precisely (or even generally) what that exception means, but if there is any category of jobs for whose performance party affiliation is not an appropriate requirement, it is the job of being a judge, where

---

[8] A decade later, in *Anderson* v. *Celebrezze,* 460 U. S., at 794, this Court decided that a law burdening independent candidates, by "limiting the opportunities of independent-minded voters to associate in the electoral arena to enhance their political effectiveness as a group," would burden associational choices and thereby "threaten to reduce diversity and competition in the marketplace of ideas." We concluded that "the primary values protected by the First Amendment —'a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open,' *New York Times Co.* v. *Sullivan,* 376 U. S. 254, 270 (1964)—are served when election campaigns are not monopolized by the existing political parties." *Ibid.*

partisanship is not only unneeded but positively undesirable. It is, however, rare that a federal administration of one party will appoint a judge from another party. And it has always been rare. See *Marbury* v. *Madison*, 1 Cranch 137 (1803). Thus, the new principle that the Court today announces will be enforced by a corps of judges (the Members of this Court included) who overwhelmingly owe their office to its violation. Something must be wrong here, and I suggest it is the Court.

The merit principle for government employment is probably the most favored in modern America, having been widely adopted by civil service legislation at both the state and federal levels. But there is another point of view, described in characteristically Jacksonian fashion by an eminent practitioner of the patronage system, George Washington Plunkitt of Tammany Hall:

> "I ain't up on sillygisms, but I can give you some arguments that nobody can answer.
>
> "First, this great and glorious country was built up by political parties; second, parties can't hold together if their workers don't get offices when they win; third, if the parties go to pieces, the government they built up must go to pieces, too; fourth, then there'll be hell to pay." W. Riordon, Plunkitt of Tammany Hall 13 (1963).

It may well be that the Good Government Leagues of America were right, and that Plunkitt, James Michael Curley, and their ilk were wrong; but that is not entirely certain. As the merit principle has been extended and its effects increasingly felt; as the Boss Tweeds, the Tammany Halls, the Pendergast Machines, the Byrd Machines, and the Daley Machines have faded into history; we find that political leaders at all levels increasingly complain of the helplessness of elected government, unprotected by "party discipline," before the demands of small and cohesive interest groups.

The choice between patronage and the merit principle—or, to be more realistic about it, the choice between the desirable mix of merit and patronage principles in widely varying federal, state, and local political contexts—is not so clear that I would be prepared, as an original matter, to chisel a single, inflexible prescription into the Constitution. Fourteen years ago, in *Elrod* v. *Burns*, 427 U. S. 347 (1976), the Court did that. *Elrod* was limited however, as was the later decision of *Branti* v. *Finkel*, 445 U. S. 507 (1980), to patronage firings, leaving it to state and federal legislatures to determine when and where political affiliation could be taken into account in hirings and promotions. Today the Court makes its constitutional civil service reform absolute, extending to all decisions regarding government employment. Because the First Amendment has never been thought to require this disposition, which may well have disastrous consequences for our political system, I dissent.

## I

The restrictions that the Constitution places upon the government in its capacity as lawmaker, *i. e.*, as the regulator of private conduct, are not the same as the restrictions that it places upon the government in its capacity as employer. We have recognized this in many contexts, with respect to many different constitutional guarantees. Private citizens perhaps cannot be prevented from wearing long hair, but policemen can. *Kelley* v. *Johnson*, 425 U. S. 238, 247 (1976). Private citizens cannot have their property searched without probable cause, but in many circumstances government employees can. *O'Connor* v. *Ortega*, 480 U. S. 709, 723 (1987) (plurality opinion); *id.*, at 732 (SCALIA, J., concurring in judgment). Private citizens cannot be punished for refusing to provide the government information that may incriminate them, but government employees can be dismissed when the incriminating information that they refuse to provide relates to the performance of their jobs. *Gardner* v. *Broderick*, 392

U. S. 273, 277–278 (1968). With regard to freedom of speech in particular: Private citizens cannot be punished for speech of merely private concern, but government employees can be fired for that reason. *Connick* v. *Myers*, 461 U. S. 138, 147 (1983). Private citizens cannot be punished for partisan political activity, but federal and state employees can be dismissed and otherwise punished for that reason. *Public Workers* v. *Mitchell*, 330 U. S. 75, 101 (1947); *Civil Service Comm'n* v. *Letter Carriers*, 413 U. S. 548, 556 (1973); *Broadrick* v. *Oklahoma*, 413 U. S. 601, 616–617 (1973).

Once it is acknowledged that the Constitution's prohibition against laws "abridging the freedom of speech" does not apply to laws enacted in the government's capacity as employer in the same way that it does to laws enacted in the government's capacity as regulator of private conduct, it may sometimes be difficult to assess what employment practices are permissible and what are not. That seems to me not a difficult question, however, in the present context. The provisions of the Bill of Rights were designed to restrain transient majorities from impairing long-recognized personal liberties. They did not create by implication novel individual rights overturning accepted political norms. Thus, when a practice not expressly prohibited by the text of the Bill of Rights bears the endorsement of a long tradition of open, widespread, and unchallenged use that dates back to the beginning of the Republic, we have no proper basis for striking it down.[1] Such a venerable and accepted tradition is not to

---

[1] The customary invocation of *Brown* v. *Board of Education*, 347 U. S. 483 (1954), as demonstrating the dangerous consequences of this principle, see *ante*, at 82 (STEVENS, J., concurring), is unsupportable. I argue for the role of tradition in giving content only to *ambiguous* constitutional text; no tradition can supersede the Constitution. In my view the Fourteenth Amendment's requirement of "equal protection of the laws," combined with the Thirteenth Amendment's abolition of the institution of black slavery, leaves no room for doubt that laws treating people differently because of their race are invalid. Moreover, even if one does not regard the Fourteenth Amendment as crystal clear on this point, a tradition of *un-*

be laid on the examining table and scrutinized for its conformity to some abstract principle of First Amendment adjudication devised by this Court. To the contrary, such traditions are themselves the stuff out of which the Court's principles are to be formed. They are, in these uncertain areas, the very points of reference by which the legitimacy or illegitimacy of *other* practices is to be figured out. When it appears that the latest "rule," or "three-part test," or "balancing test" devised by the Court has placed us on a collision course with such a landmark practice, it is the former that must be recalculated by us, and not the latter that must be abandoned by our citizens. I know of no other way to formulate a constitutional jurisprudence that reflects, as it should, the principles adhered to, over time, by the American people, rather than those favored by the personal (and necessarily shifting) philosophical dispositions of a majority of this Court.

I will not describe at length the claim of patronage to landmark status as one of our accepted political traditions. Justice Powell discussed it in his dissenting opinions in *Elrod* and *Branti*. *Elrod, supra*, at 378–379; *Branti, supra*, at 522, n. 1. Suffice it to say that patronage was, without any thought that it could be unconstitutional, a basis for government employment from the earliest days of the Republic until *Elrod*—and has continued unabated *since Elrod*, to the extent still permitted by that unfortunate decision. See, *e. g.*, D. Price, Bringing Back the Parties 24, 32 (1984); Gardner, A Theory of the Spoils System, 54 Public Choice 171, 181 (1987); Toinet & Glenn, Clientelism and Corruption in the "Open" Society: The Case of the United States, in Private Patronage and Public Power 193, 202 (C. Clapham ed.

---

*challenged* validity did not exist with respect to the practice in *Brown*. To the contrary, in the 19th century the principle of "separate-but-equal" had been vigorously opposed on constitutional grounds, litigated up to this Court, and upheld only over the dissent of one of our historically most respected Justices. See *Plessy* v. *Ferguson*, 163 U. S. 537, 555–556 (1896) (Harlan, J., dissenting).

1982). Given that unbroken tradition regarding the application of an ambiguous constitutional text, there was in my view no basis for holding that patronage-based dismissals violated the First Amendment—much less for holding, as the Court does today, that even patronage hiring does so.[2]

## II

Even accepting the Court's own mode of analysis, however, and engaging in "balancing" a tradition that ought to be part of the scales, *Elrod*, *Branti*, and today's extension of them seem to me wrong.

### A

The Court limits patronage on the ground that the individual's interest in uncoerced belief and expression outweighs the systemic interests invoked to justify the practice. *Ante*,

---

[2] JUSTICE STEVENS seeks to counteract this tradition by relying upon the supposed "unequivocal repudiation" of the right-privilege distinction. *Ante*, at 83. That will not do. If the right-privilege distinction was once used to explain the practice, and if that distinction is to be repudiated, then one must simply devise some other theory to explain it. The order of precedence is that a constitutional theory must be wrong if its application contradicts a clear constitutional tradition; not that a clear constitutional tradition must be wrong if it does not conform to the current constitutional theory. On JUSTICE STEVENS' view of the matter, this Court examines a historical practice, endows it with an intellectual foundation, and later, by simply undermining that foundation, relegates the constitutional tradition to the dustbin of history. That is not how constitutional adjudication works. Cf. *Burnham* v. *Superior Court of California, Marin County*, 495 U. S. 604 (1990) (opinion of SCALIA, J.). I am not sure, in any event, that the right-privilege distinction has been as unequivocally rejected as JUSTICE STEVENS supposes. It has certainly been recognized that the fact that the government need not confer a certain benefit does not mean that it can attach any conditions whatever to the conferral of that benefit. But it remains true that certain conditions can be attached to benefits that cannot be imposed as prescriptions upon the public at large. If JUSTICE STEVENS chooses to call this something other than a right-privilege distinction, that is fine and good—but it is in any case what explains the nonpatronage restrictions upon federal employees that the Court continues to approve, and there is no reason why it cannot support patronage restrictions as well.

at 68–72. The opinion indicates that the government may prevail only if it proves that the practice is "narrowly tailored to further vital government interests." *Ante,* at 74.

That strict-scrutiny standard finds no support in our cases. Although our decisions establish that government employees do not lose all constitutional rights, we have consistently applied a lower level of scrutiny when "the governmental function operating . . . [is] not the power to regulate or license, as lawmaker, an entire trade or profession, or to control an entire branch of private business, but, rather, as proprietor, to manage [its] internal operatio[ns] . . . ." *Cafeteria & Restaurant Workers* v. *McElroy,* 367 U. S. 886, 896 (1961). When dealing with its own employees, the government may not act in a manner that is "patently arbitrary or discriminatory," *id.,* at 898, but its regulations are valid if they bear a "rational connection" to the governmental end sought to be served, *Kelley* v. *Johnson,* 425 U. S., at 247.

In particular, restrictions on speech by public employees are not judged by the test applicable to similar restrictions on speech by nonemployees. We have said that "[a] governmental employer may subject its employees to such special restrictions on free expression as are reasonably necessary to promote effective government." *Brown* v. *Glines,* 444 U. S. 348, 356, n. 13 (1980). In *Public Workers* v. *Mitchell,* 330 U. S., at 101, upholding provisions of the Hatch Act which prohibit political activities by federal employees, we said that "it is not necessary that the act regulated be anything more than an act reasonably deemed by Congress to interfere with the efficiency of the public service." We reaffirmed *Mitchell* in *Civil Service Comm'n* v. *Letter Carriers,* 413 U. S., at 556, over a dissent by Justice Douglas arguing against application of a special standard to Government employees, except insofar as their "job performance" is concerned, *id.,* at 597. We did not say that the Hatch Act was narrowly tailored to meet

the government's interest, but merely deferred to the judgment of Congress, which we were not "in any position to dispute." *Id.*, at 567. Indeed, we recognized that the Act was not indispensably necessary to achieve those ends, since we repeatedly noted that "Congress at some time [may] come to a different view." *Ibid.;* see also *id.*, at 555, 564. In *Broadrick* v. *Oklahoma*, 413 U. S. 601 (1973), we upheld similar restrictions on state employees, though directed "at political expression which if engaged in by private persons would plainly be protected by the First and Fourteenth Amendments," *id.*, at 616.

To the same effect are cases that specifically concern adverse employment action taken against public employees because of their speech. In *Pickering* v. *Board of Education of Township High School Dist.*, 391 U. S. 563, 568 (1968), we recognized:

> "[T]he State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general. The problem in any case is to arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."

Because the restriction on speech is more attenuated when the government conditions employment than when it imposes criminal penalties, and because "government offices could not function if every employment decision became a constitutional matter," *Connick* v. *Myers*, 461 U. S., at 143, we have held that government employment decisions taken on the basis of an employee's speech do not "abridg[e] the freedom of speech," U. S. Const., Amdt. 1, merely because they fail

the narrow-tailoring and compelling-interest tests applicable to direct regulation of speech. We have not subjected such decisions to strict scrutiny, but have accorded "a wide degree of deference to the employer's judgment" that an employee's speech will interfere with close working relationships. 461 U. S., at 152.

When the government takes adverse action against an employee on the basis of his political affiliation (an interest whose constitutional protection is derived from the interest in speech), the same analysis applies. That is why both the *Elrod* plurality, 427 U. S., at 359, and the opinion concurring in the judgment, *id.*, at 375, as well as *Branti*, 445 U. S., at 514–515, and the Court today, *ante*, at 72, rely on *Perry* v. *Sindermann*, 408 U. S. 593 (1972), a case that applied the test announced in *Pickering*, not the strict-scrutiny test applied to restrictions imposed on the public at large. Since the government may dismiss an employee for political *speech* "reasonably deemed by Congress to interfere with the efficiency of the public service," *Public Workers* v. *Mitchell*, *supra*, at 101, it follows, *a fortiori*, that the government may dismiss an employee for political *affiliation* if "reasonably necessary to promote effective government." *Brown* v. *Glines*, *supra*, at 356, n. 13.

While it is clear from the above cases that the normal "strict scrutiny" that we accord to government regulation of speech is not applicable in this field,[3] the precise test that re-

---

[3] The Court calls our description of the appropriate standard of review "questionable," and suggests that these cases applied strict scrutiny ("even *were* JUSTICE SCALIA correct that less-than-strict scrutiny is appropriate"). *Ante*, at 70, n. 4 (emphasis added). This suggestion is incorrect, does not aid the Court's argument, and if accepted would eviscerate the strict-scrutiny standard. It is incorrect because even a casual perusal of the cases reveals that the governmental actions were sustained, not because they were shown to be "narrowly tailored to further vital government interests," *ante*, at 74, but because they were "reasonably" deemed necessary to promote effective government. It does not aid the Court's argument, moreover, because *whatever* standard those cases applied must

places it is not so clear; we have used various formulations. The one that appears in the case dealing with an employment practice closest in its effects to patronage is whether the

---

be applied here, and if the asserted interests in patronage are as weighty as those proffered in the previous cases, then *Elrod* and *Branti* were wrongly decided. It eviscerates the standard, finally, because if the practices upheld in those cases survived strict scrutiny, then the so-called "strict-scrutiny" test means nothing. Suppose a State made it unlawful for an employee of a privately owned nuclear powerplant to criticize his employer. Can there be any doubt that we would reject out of hand the State's argument that the statute was justified by the compelling interest in maintaining the appearance that such employees are operating nuclear plants properly, so as to maintain public confidence in the plants' safety? But cf. *Civil Service Comm'n* v. *Letter Carriers*, 413 U. S. 548, 565 (1973) (Hatch Act justified by need for Government employees to "appear to the public to be avoiding [political partiality], if confidence in the system of representative Government is not to be eroded"). Suppose again that a State prohibited a private employee from speaking on the job about matters of private concern. Would we even hesitate before dismissing the State's claim that the compelling interest in fostering an efficient economy overrides the individual's interest in speaking on such matters? But cf. *Connick* v. *Myers*, 461 U. S. 138, 147 (1983) ("[W]hen a public employee speaks . . . upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior"). If the Court thinks that strict scrutiny is appropriate in all these cases, then it should forthrightly admit that *Public Workers* v. *Mitchell*, 330 U. S. 75 (1947), *Letter Carriers, supra, Pickering* v. *Board of Education of Township High School Dist.*, 391 U. S. 563 (1968), *Connick, supra*, and similar cases were mistaken and should be overruled; if it rejects that course, then it should admit that those cases applied, as they said they did, a reasonableness test.

   The Court's further contention that these cases are limited to the "interests that the government has in its capacity as an employer," *ante*, at 70, n. 4, as distinct from its interests "in the structure and functioning of society as a whole," *ibid.*, is neither true nor relevant. Surely a principal reason for the statutes that we have upheld preventing political activity by government employees—and indeed the *only* substantial reason, with respect to those employees who are permitted to be hired and fired on a political basis—is to prevent the party in power from obtaining what is considered an unfair advantage in political campaigns. That is precisely the

practice could be "reasonably deemed" by the enacting legislature to further a legitimate goal. *Public Workers* v. *Mitchell*, 330 U. S., at 101. For purposes of my ensuing discussion, however, I will apply a less permissive standard that seems more in accord with our general "balancing" test: Can the governmental advantages of this employment practice reasonably be deemed to outweigh its "coercive" effects?

## B

Preliminarily, I may observe that the Court today not only declines, in this area replete with constitutional ambiguities, to give the clear and continuing tradition of our people the *dispositive* effect I think it deserves, but even declines to give it substantial weight in the balancing. That is contrary to what the Court has done in many other contexts. In eval-

---

type of governmental interest at issue here. But even if the Court were correct, I see no reason in policy or principle why the government would be limited to furthering *only* its interests "as an employer." In fact, we have seemingly approved the furtherance of broader governmental interests through employment restrictions. In *Hampton* v. *Mow Sun Wong*, 426 U. S. 88 (1976), we held unlawful a Civil Service Commission regulation prohibiting the hiring of aliens on the ground that the Commission lacked the requisite authority. We were willing, however, to "assume . . . that if the Congress or the President had expressly imposed the citizenship requirement, it would be justified by the national interest in providing an incentive for aliens to become naturalized, or possibly even as providing the President with an expendable token for treaty negotiating purposes." *Id.*, at 105. Three months after our opinion, the President adopted the restriction by Executive Order. Exec. Order No. 11935, 3 CFR 146 (1976 Comp.). On remand, the lower courts denied the *Mow Sun Wong* plaintiffs relief on the basis of this new Executive Order and relying upon the interest in providing an incentive for citizenship. *Mow Sun Wong* v. *Hampton*, 435 F. Supp. 37 (ND Cal. 1977), aff'd, 626 F. 2d 739 (CA9 1980). We denied certiorari *sub nom. Lum* v. *Campbell*, 450 U. S. 959 (1981). In other cases, the lower federal courts have uniformly reached the same result. See, *e. g., Jalil* v. *Campbell*, 192 U. S. App. D. C. 4, 7, n. 3, 590 F. 2d 1120, 1123, n. 3 (1978); *Vergara* v. *Hampton*, 581 F. 2d 1281 (CA7 1978), cert. denied, 441 U. S. 905 (1979); *Santin Ramos* v. *United States Civil Service Comm'n*, 430 F. Supp. 422 (PR 1977) (three-judge court).

uating so-called "substantive due process" claims we have examined our history and tradition with respect to the asserted right. See, *e. g.*, *Michael H.* v. *Gerald D.*, 491 U. S. 110 (1989); *Bowers* v. *Hardwick*, 478 U. S. 186, 192–194 (1986). In evaluating claims that a particular procedure violates the Due Process Clause we have asked whether the procedure is traditional. See, *e. g.*, *Burnham* v. *Superior Court of California, Marin County*, 495 U. S. 604 (1990). And in applying the Fourth Amendment's reasonableness test we have looked to the history of judicial and public acceptance of the type of search in question. See, *e. g.*, *Camara* v. *Municipal Court of San Francisco*, 387 U. S. 523, 537 (1967). See also *Press-Enterprise Co.* v. *Superior Court of California, Riverside County*, 478 U. S. 1, 8 (1986) (tradition of accessibility to judicial proceedings implies judgment of experience that individual's interest in access outweighs government's interest in closure); *Richmond Newspapers, Inc.* v. *Virginia*, 448 U. S. 555, 589 (1980) (BRENNAN, J., concurring in judgment) ("Such a tradition [of public access] commands respect in part because the Constitution carries the gloss of history"); *Walz* v. *Tax Comm'n of New York City*, 397 U. S. 664, 678 (1970) ("unbroken practice of according the [property tax] exemption to churches" demonstrates that it does not violate Establishment Clause).

But even laying tradition entirely aside, it seems to me our balancing test is amply met. I assume, as the Court's opinion assumes, that the balancing is to be done on a generalized basis, and not case by case. The Court holds that the governmental benefits of patronage cannot reasonably be thought to outweigh its "coercive" effects (even the lesser "coercive" effects of patronage hiring as opposed to patronage firing) not merely in 1990 in the State of Illinois, but at any time in any of the numerous political subdivisions of this vast country. It seems to me that that categorical pronouncement reflects a naive vision of politics and an inadequate appreciation of the systemic effects of patronage in promoting political sta-

bility and facilitating the social and political integration of previously powerless groups.

The whole point of my dissent is that the desirability of patronage is a policy question to be decided by the people's representatives; I do not mean, therefore, to endorse that system. But in order to demonstrate that a legislature could reasonably determine that its benefits outweigh its "coercive" effects, I must describe those benefits as the proponents of patronage see them: As Justice Powell discussed at length in his *Elrod* dissent, patronage stabilizes political parties and prevents excessive political fragmentation—both of which are results in which States have a strong governmental interest. Party strength requires the efforts of the rank and file, especially in "the dull periods between elections," to perform such tasks as organizing precincts, registering new voters, and providing constituent services. *Elrod*, 427 U. S., at 385 (dissenting opinion). Even the most enthusiastic supporter of a party's program will shrink before such drudgery, and it is folly to think that ideological conviction alone will motivate sufficient numbers to keep the party going through the off years. "For the most part, as every politician knows, the hope of some reward generates a major portion of the local political activity supporting parties." *Ibid.* Here is the judgment of one such politician, Jacob Arvey (best known as the promoter of Adlai Stevenson): Patronage is "'a necessary evil if you want a strong organization, because the patronage system permits of discipline, and without discipline, there's no party organization.'" Quoted in M. Tolchin & S. Tolchin, To the Victor 36 (1971). A major study of the patronage system describes the reality as follows:

> "[A]lthough men have many motives for entering political life . . . the vast underpinning of both major parties is made up of men who seek practical rewards. Tangible advantages constitute the unifying thread of most successful political practitioners" *Id.*, at 22.

> "With so little patronage cement, party discipline is relatively low; the rate of participation and amount of service the party can extract from [Montclair] county committeemen are minuscule compared with Cook County. The party considers itself lucky if 50 percent of its committeemen show up at meetings — even those labeled 'urgent' — while even lower percentages turn out at functions intended to produce crowds for visiting candidates." *Id.*, at 123.

See also W. Grimshaw, The Political Economy of Machine Politics, 4 Corruption and Reform 15, 30 (1989); G. Pomper, Voters, Elections, and Parties 255 (1988); Wolfinger, Why Political Machines Have Not Withered Away and Other Revisionist Thoughts, 34 J. Politics 365, 384 (1972).

The Court simply refuses to acknowledge the link between patronage and party discipline, and between that and party success. It relies (as did the plurality in *Elrod, supra,* at 369, n. 23) on a single study of a rural Pennsylvania county by Professor Sorauf, *ante,* at 75 — a work that has been described as "more persuasive about the ineffectuality of Democratic leaders in Centre County than about the generalizability of [its] findings." Wolfinger, *supra,* at 384, n. 39. It is unpersuasive to claim, as the Court does, that party workers are obsolete because campaigns are now conducted through media and other money-intensive means. *Ante,* at 75. Those techniques have supplemented but not supplanted personal contacts. See Price, Bringing Back the Parties, at 25. Certainly they have not made personal contacts unnecessary in campaigns for the lower level offices that are the foundations of party strength, nor have they replaced the myriad functions performed by party regulars not directly related to campaigning. And to the extent such techniques have replaced older methods of campaigning (partly in response to the limitations the Court has placed on patronage), the political system is not clearly better off. See *Elrod, supra,* at 384 (Powell, J., dissenting); *Branti,* 445

U. S., at 528 (Powell, J., dissenting).   Increased reliance on money-intensive campaign techniques tends to entrench those in power much more effectively than patronage—but without the attendant benefit of strengthening the party system.   A challenger can more easily obtain the support of party workers (who can expect to be rewarded even if the candidate loses—if not this year, then the next) than the financial support of political action committees (which will generally support incumbents, who are likely to prevail).

It is self-evident that eliminating patronage will significantly undermine party discipline; and that as party discipline wanes, so will the strength of the two-party system. But, says the Court, "[p]olitical parties have already survived the substantial decline in patronage employment practices in this century." *Ante,* at 74.   This is almost verbatim what was said in *Elrod,* see 427 U. S., at 369.   Fourteen years later it seems much less convincing.   Indeed, now that we have witnessed, in 18 of the last 22 years, an Executive Branch of the Federal Government under the control of one party while the Congress is entirely or (for two years) partially within the control of the other party; now that we have undergone the most recent federal election, in which 98% of the incumbents, of whatever party, were returned to office; and now that we have seen elected officials changing their political affiliation with unprecedented readiness, Washington Post, Apr. 10, 1990, p. A1, the statement that "political parties have already survived" has a positively whistling-in-the-graveyard character to it.   Parties have assuredly survived—but as what?   As the forges upon which many of the essential compromises of American political life are hammered out?   Or merely as convenient vehicles for the conducting of national Presidential elections?

The patronage system does not, of course, merely foster political parties in general; it fosters the two-party system in particular.   When getting a job, as opposed to effectuating a particular substantive policy, is an available incentive for

party workers, those attracted by that incentive are likely to work for the party that has the best chance of displacing the "ins," rather than for some splinter group that has a more attractive political philosophy but little hope of success. Not only is a two-party system more likely to emerge, but the differences between those parties are more likely to be moderated, as each has a relatively greater interest in appealing to a majority of the electorate and a relatively lesser interest in furthering philosophies or programs that are far from the mainstream. The stabilizing effects of such a system are obvious. See Toinet & Glenn, Clientelism and Corruption in the "Open" Society, at 208. In the context of electoral laws we have approved the States' pursuit of such stability, and their avoidance of the "splintered parties and unrestrained factionalism [that] may do significant damage to the fabric of government." *Storer* v. *Brown*, 415 U. S. 724, 736 (1974) (upholding law disqualifying persons from running as independents if affiliated with a party in the past year).

Equally apparent is the relatively destabilizing nature of a system in which candidates cannot rely upon patronage-based party loyalty for their campaign support, but must attract workers and raise funds by appealing to various interest groups. See Tolchin & Tolchin, To the Victor, at 127–130. There is little doubt that our decisions in *Elrod* and *Branti*, by contributing to the decline of party strength, have also contributed to the growth of interest-group politics in the last decade. See, *e. g.*, Fitts, The Vice of Virtue, 136 U. Pa. L. Rev. 1567, 1603–1607 (1988). Our decision today will greatly accelerate the trend. It is not only campaigns that are affected, of course, but the subsequent behavior of politicians once they are in power. The replacement of a system firmly in party discipline with one in which each officeholder comes to his own accommodation with competing interest groups produces "a dispersion of political influence that may inhibit a

political party from enacting its programs into law." *Branti, supra,* at 531 (Powell, J., dissenting).[4]

Patronage, moreover, has been a powerful means of achieving the social and political integration of excluded groups. See, *e. g., Elrod,* 427 U. S., at 379 (Powell, J., dissenting); Cornwell, Bosses, Machines and Ethnic Politics, in Ethnic Group Politics 190, 195–197 (H. Bailey, Jr., & E. Katz eds. 1969). By supporting and ultimately dominating a particular party "machine," racial and ethnic minorities have—on the basis of their politics rather than their race or ethnicity—acquired the patronage awards the machine had power to confer. No one disputes the historical accuracy of this observation, and there is no reason to think that patronage can no longer serve that function. The abolition of patronage, however, prevents groups that have only recently obtained political power, especially blacks, from following this path to economic and social advancement.

> " 'Every ethnic group that has achieved political power in American cities has used the bureaucracy to provide jobs in return for political support. It's only when Blacks begin to play the same game that the rules get changed. Now the use of such jobs to build political bases becomes an "evil" activity, and the city insists on taking the control back "downtown." ' " New York Amsterdam News, Apr. 1, 1978, p. A–4, quoted in Hamilton, The Patron-Recipient Relationship and Minority Politics in New York City, 94 Pol. Sci. Q. 211, 212 (1979).

While the patronage system has the benefits argued for above, it also has undoubted disadvantages. It facilitates financial corruption, such as salary kickbacks and partisan political activity on government-paid time. It reduces the effi-

---

[4]JUSTICE STEVENS discounts these systemic effects when he characterizes patronage as fostering partisan, rather than public, interests. *Ante,* at 88. But taking JUSTICE STEVENS at his word, one wonders why patronage can *ever* be an "appropriate requirement for the position involved," *ante,* at 64.

ciency of government, because it creates incentives to hire more and less qualified workers and because highly qualified workers are reluctant to accept jobs that may only last until the next election. And, of course, it applies some greater or lesser inducement for individuals to join and work for the party in power.

To hear the Court tell it, this last is the greatest evil. That is not my view, and it has not historically been the view of the American people. Corruption and inefficiency, rather than abridgment of liberty, have been the major criticisms leading to enactment of the civil service laws—for the very good reason that the patronage system does not have as harsh an effect upon conscience, expression, and association as the Court suggests. As described above, it is the nature of the pragmatic, patronage-based, two-party system to build alliances and to suppress rather than foster ideological tests for participation in the division of political "spoils." What the patronage system ordinarily demands of the party worker is loyalty to, and activity on behalf of, the organization itself rather than a set of political beliefs. He is generally free to urge *within the organization* the adoption of any political position; but if that position is rejected he must vote and work for the party nonetheless. The diversity of political expression (other than expression of party loyalty) is channeled, in other words, to a different stage—to the contests for party endorsement rather than the partisan elections. It is undeniable, of course, that the patronage system entails some constraint upon the expression of views, particularly at the partisan-election stage, and considerable constraint upon the employee's right to associate with the other party. It greatly exaggerates these, however, to describe them as a general " 'coercion of belief,' " *ante*, at 71, quoting *Branti*, 445 U. S., at 516; see also *ante*, at 75; *Elrod, supra*, at 355 (plurality opinion). Indeed, it greatly exaggerates them to call them "coercion" at all, since we generally make a distinction between inducement and compulsion. The public official

offered a bribe is not "coerced" to violate the law, and the private citizen offered a patronage job is not "coerced" to work for the party. In sum, I do not deny that the patronage system influences or redirects, perhaps to a substantial degree, individual political expression and political association. But like the many generations of Americans that have preceded us, I do not consider that a significant impairment of free speech or free association.

In emphasizing the advantages and minimizing the disadvantages (or at least minimizing one of the disadvantages) of the patronage system, I do not mean to suggest that that system is best. It may not always be; it may never be. To oppose our *Elrod-Branti* jurisprudence, one need not believe that the patronage system is *necessarily* desirable; nor even that it is always and everywhere *arguably* desirable; but merely that it is a political arrangement that may sometimes be a reasonable choice, and should therefore be left to the judgment of the people's elected representatives. The choice in question, I emphasize, is not just between patronage and a merit-based civil service, but rather among various combinations of the two that may suit different political units and different eras: permitting patronage hiring, for example, but prohibiting patronage dismissal; permitting patronage in most municipal agencies but prohibiting it in the police department; or permitting it in the mayor's office but prohibiting it everywhere else. I find it impossible to say that, always and everywhere, all of these choices fail our "balancing" test.

### C

The last point explains why *Elrod* and *Branti* should be overruled, rather than merely not extended. Even in the field of constitutional adjudication, where the pull of *stare decisis* is at its weakest, see *Glidden Co.* v. *Zdanok*, 370 U. S. 530, 543 (1962) (opinion of Harlan, J.), one is reluctant to depart from precedent. But when that precedent is not only wrong, not only recent, not only contradicted by a long prior

tradition, but also has proved unworkable in practice, then all reluctance ought to disappear. In my view that is the situation here. Though unwilling to leave it to the political process to draw the line between desirable and undesirable patronage, the Court has neither been prepared to rule that no such line exists (*i. e.*, that *all* patronage is unconstitutional) nor able to design the line itself in a manner that judges, lawyers, and public employees can understand. *Elrod* allowed patronage dismissals of persons in "policymaking" or "confidential" positions. 427 U. S., at 367 (plurality opinion); *id.*, at 375 (Stewart, J., concurring in judgment). *Branti* retreated from that formulation, asking instead "whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." 445 U. S., at 518. What that means is anybody's guess. The Courts of Appeals have devised various tests for determining when "affiliation is an appropriate requirement." See generally Martin, A Decade of *Branti* Decisions: A Government Officials' Guide to Patronage Dismissals, 39 Am. U. L. Rev. 11, 23–42 (1989). These interpretations of *Branti* are not only significantly at variance with each other; they are still so general that for most positions it is impossible to know whether party affiliation is a permissible requirement until a court renders its decision.

A few examples will illustrate the shambles *Branti* has produced. A city cannot fire a deputy sheriff because of his political affiliation,[5] but then again perhaps it can,[6] especially if he is called the "police captain."[7] A county cannot fire on that basis its attorney for the department of social

---

[5] *Jones* v. *Dodson*, 727 F. 2d 1329, 1338 (CA4 1984).

[6] *McBee* v. *Jim Hogg County*, 730 F. 2d 1009, 1014–1015 (CA5 1984) (en banc).

[7] *Joyner* v. *Lancaster*, 553 F. Supp. 809, 818 (MDNC 1982), later proceeding, 815 F. 2d 20, 24 (CA4), cert. denied, 484 U. S. 830 (1987).

services,[8] nor its assistant attorney for family court,[9] but a city can fire its solicitor and his assistants,[10] or its assistant city attorney,[11] or its assistant state's attorney,[12] or its corporation counsel.[13] A city cannot discharge its deputy court clerk for his political affiliation,[14] but it can fire its legal assistant to the clerk on that basis.[15] Firing a juvenile court bailiff seems impermissible,[16] but it may be permissible if he is assigned permanently to a single judge.[17] A city cannot fire on partisan grounds its director of roads,[18] but it can fire the second in command of the water department.[19] A government cannot discharge for political reasons the senior vice president of its development bank,[20] but it can discharge the regional director of its rural housing administration.[21]

The examples could be multiplied, but this summary should make obvious that the "tests" devised to implement *Branti* have produced inconsistent and unpredictable results. That uncertainty undermines the purpose of both the nonpatron-

---

[8] *Layden* v. *Costello*, 517 F. Supp. 860, 862 (NDNY 1981).

[9] *Tavano* v. *County of Niagara*, 621 F. Supp. 345, 349–350 (WDNY 1985), aff'd mem., 800 F. 2d 1128 (CA2 1986).

[10] *Ness* v. *Marshall*, 660 F. 2d 517, 521–522 (CA3 1981); *Montaquila* v. *St. Cyr*, 433 A. 2d 206, 211 (R. I. 1981).

[11] *Finkelstein* v. *Barthelemy*, 678 F. Supp. 1255, 1265 (ED La. 1988).

[12] *Livas* v. *Petka*, 711 F. 2d 798, 800–801 (CA7 1983).

[13] *Bavoso* v. *Harding*, 507 F. Supp. 313, 316 (SDNY 1980).

[14] *Barnes* v. *Bosley*, 745 F. 2d 501, 508 (CA8 1984), cert. denied, 471 U. S. 1017 (1985).

[15] *Bauer* v. *Bosley*, 802 F. 2d 1058, 1063 (CA8 1986), cert. denied, 481 U. S. 1038 (1987).

[16] *Elrod* v. *Burns*, 427 U. S. 347, 351 (1976).

[17] *Balogh* v. *Charron*, 855 F. 2d 356 (CA6 1988).

[18] *Abraham* v. *Pekarski*, 537 F. Supp. 858, 865 (ED Pa. 1982), aff'd in part and dism'd in part, 728 F. 2d 167 (CA3), cert. denied, 467 U. S. 1242 (1984).

[19] *Tomczak* v. *Chicago*, 765 F. 2d 633 (CA7), cert. denied, 474 U. S. 946 (1985).

[20] *De Choudens* v. *Government Development Bank of Puerto Rico*, 801 F. 2d 5, 10 (CA1 1986) (en banc), cert. denied, 481 U. S. 1013 (1987).

[21] *Rosario Nevarez* v. *Torres Gaztambide*, 820 F. 2d 525 (CA1 1987).

age rule and the exception. The rule achieves its objective of preventing the "coercion" of political affiliation, see *supra*, at 97, only if the employee is confident that he can engage in (or refrain from) political activities without risking dismissal. Since the current doctrine leaves many employees utterly in the dark about whether their jobs are protected, they are likely to play it safe. On the other side, the exception was designed to permit the government to implement its electoral mandate. *Elrod*, *supra*, at 367 (plurality opinion). But unless the government is fairly sure that dismissal is permitted, it will leave the politically uncongenial official in place, since an incorrect decision will expose it to lengthy litigation and a large damages award, perhaps even against the responsible officials personally.

This uncertainty and confusion are not the result of the fact that *Elrod*, and then *Branti*, chose the wrong "line." My point is that there is no right line—or at least no right line that can be nationally applied and that is known by judges. Once we reject as the criterion a long political tradition showing that party-based employment is entirely permissible, yet are unwilling (as any reasonable person must be) to replace it with the principle that party-based employment is entirely impermissible, we have left the realm of law and entered the domain of political science, seeking to ascertain when and where the undoubted benefits of political hiring and firing are worth its undoubted costs. The answer to that will vary from State to State, and indeed from city to city, even if one rejects out of hand (as the *Branti* line does) the benefits associated with party stability. Indeed, the answer will even vary from year to year. During one period, for example, it may be desirable for the manager of a municipally owned public utility to be a career specialist, insulated from the political system. During another, when the efficient operation of that utility or even its very existence has become a burning political issue, it may be desirable that he be hired and fired on a political basis. The appropriate "mix" of party-based

employment is a political question if there ever was one, and we should give it back to the voters of the various political units to decide, through civil service legislation crafted to suit the time and place, which mix is best.

### III

Even were I not convinced that *Elrod* and *Branti* were wrongly decided, I would hold that they should not be extended beyond their facts, viz., actual discharge of employees for their political affiliation.  Those cases invalidated patronage firing in order to prevent the "restraint it places on freedoms of belief and association."  *Elrod*, 427 U. S., at 355 (plurality opinion); see also *id.*, at 357 (patronage "compels or restrains" and "inhibits" belief and association).  The loss of one's current livelihood is an appreciably greater constraint than such other disappointments as the failure to obtain a promotion or selection for an uncongenial transfer.  Even if the "coercive" effect of the former has been held always to outweigh the benefits of party-based employment decisions, the "coercive" effect of the latter should not be.  We have drawn a line between firing and other employment decisions in other contexts, see *Wygant* v. *Jackson Bd. of Education*, 476 U. S. 267, 282–283 (1986) (plurality opinion), and should do so here as well.

I would reject the alternative that the Seventh Circuit adopted in this case, which allows a cause of action if the employee can demonstrate that he was subjected to the "substantial equivalent of dismissal."  868 F. 2d 943, 950, 954 (1989).  The trouble with that seemingly reasonable standard is that it is so imprecise that it will multiply yet again the harmful uncertainty and litigation that *Branti* has already created.  If *Elrod* and *Branti* are not to be reconsidered in light of their demonstrably unsatisfactory consequences, I would go no further than to allow a cause of action when the employee has lost his position, that is, his formal title and salary.  That narrow ground alone is enough to resolve the con-

stitutional claims in the present case. Since none of the plaintiffs has alleged loss of his position because of affiliation,[22] I would affirm the Seventh Circuit's judgment insofar as it affirmed the dismissal of petitioner Moore's claim and would reverse the Seventh Circuit's judgment insofar as it reversed the dismissal of the claims of other petitioners and of cross-respondents.

The Court's opinion, of course, not only declines to confine *Elrod* and *Branti* to dismissals in the narrow sense I have proposed, but, unlike the Seventh Circuit, even extends those opinions beyond "constructive" dismissals—indeed, even beyond adverse treatment of current employees—to all hiring decisions. In the long run there may be cause to rejoice in that extension. When the courts are flooded with litigation under that most unmanageable of standards *(Branti)* brought by that most persistent and tenacious of suitors (the disappointed officeseeker) we may be moved to reconsider our intrusion into this entire field.

In the meantime, I dissent.

---

[22] Standefer and O'Brien do not allege that their political affiliation was the reason they were laid off, but only that it was the reason they were not recalled. Complaint ¶¶ 9, 21–22, App. to Respondents' Brief in Opposition; 641 F. Supp. 249, 256, 257 (CD Ill. 1986). Those claims are essentially identical to the claims of persons wishing to be hired; neither fall within the narrow rule of *Elrod* and *Branti* against patronage firing.