# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 01-1976

_____

| | | |
|---|---|---|
| Vicki L. Jones, | * | |
| | * | |
| Appellee, | * | |
| | * | |
| v. | * | Appeal from the United States |
| | * | District Court for the |
| Paul H. Fitzgerald; | * | Southern District of Iowa. |
| E.A. (Penny) Westfall; | * | |
| Story County Sheriff's Office, | * | |
| | * | |
| Appellants. | * | |

_____

Submitted: November 16, 2001

Filed: April 4, 2002

_____

Before Judges LOKEN, LAY, and RILEY, Circuit Judges.

_____

RILEY, Circuit Judge.

After resigning from her clerical support position with the Story County Sheriff's Office, Vicki L. Jones (Jones) sued the county, the county sheriff, Paul Fitzgerald (Fitzgerald), and the former chief deputy sheriff, E.A. (Penny) Westfall (Westfall) for adverse employment action and constructive discharge in violation of the First Amendment under 42 U.S.C. § 1983. Following a jury verdict for Jones, the United States District Court for the Southern District of Iowa denied the defendants'

motion for judgment as a matter of law or, in the alternative, motion for new trial. The defendants appeal. We reverse.

## I.    BACKGROUND

In July 1991, Story County Sheriff John Stark (Stark) hired Vicki Jones as a secretary to the detectives' division. Lieutenant Gerry Bearden (Bearden), the former chief of the detectives' division, supervised Jones for over five years. The detectives' division was located in the back of the sheriff's office. By virtue of her work detail, Jones's work station was set apart from the other clerical personnel who worked in the front office area.

Soon after she commenced working, Jones experienced harassment from two office employees – Jane Page (Page), Fitzgerald's confidential secretary, and Rhonda Goosic (Goosic), a deputy sheriff who supervised all clerical employees except Jones. Jones was divorced and cohabitated with a man. Page and Goosic frequently called Jones a "skank" and made crude remarks about her having sexual relations with a man to whom she was not married. Page and Goosic also harassed Jones by giving her unassigned clerical work, making faces at her, sticking out tongues at her, whispering in hushed voices in her presence, abruptly ceasing conversations in her presence, socially isolating and excluding her, and exhibiting hostile attitudes toward her.

Jones informed her supervisor of this harassment. Lieutenant Bearden offered to help Jones, but she declined. Jones told Bearden she preferred to handle the situation herself.

In 1992, Fitzgerald campaigned for the office of Story County Sheriff against the incumbent sheriff, Stark. Fitzgerald won the election and assumed office in January 1993. A year later Fitzgerald hired Westfall as his chief deputy.

In the spring of 1994, Jones complained verbally to Fitzgerald about being harassed by Page and Goosic. On November 8, 1994, Jones submitted a formal complaint to Fitzgerald with a copy to Bearden.[1]

_____

[1]The formal complaint, in pertinent part, reads:

> [Since July, 1991,] I have been and continue to be subjected to intentional harassment by Lt. Rhonda Goosic and Secretary Jane Page. The most degrading; being sexual in nature on an almost daily basis the first year and a half of my employment.
>
> . . .
>
> Despite repeated attempts to call attention to this harassment and the negative work environment that it creates, and due to the longevity of this behavior, I must conclude that only through the elimination of these attitudes can a positive work atmosphere be maintained.
>
> I must request your immediate and effective attention to halt this humiliating and unprofessional situation. I should also point out that referring Jane Page's conduct to Lt. Goosic for administrative action is pointless since nothing ever comes of it and, in deed, they worked together. I feel there are no behavior classes effective enough, no reprimand strong enough, no demotion severe enough to bring about justifiable reasoning for Lt. Goosic's and Secretary Jane Page's attitudes and behavior, nor the nonchalant manner in which this situation has been handled to date.
>
> I look forward to your prompt attention and investigation of this problem and its swift resolution.

The sexual harassment described by Jones came from the two other women employees, Page and Goosic, and was apparently related to their criticism of Jones's life style.

The next day Jones met with Fitzgerald and Westfall concerning her written complaint. Fitzgerald noted, and Jones agreed, that the most severe harassment had occurred during the first year and a half of her employment under Sheriff Stark's administration. Fitzgerald also informed Jones that after she had earlier lodged a verbal complaint of harassment, he had spoken to Page and to Goosic, who was Page's immediate supervisor, had ordered the harassment to cease and believed the harassment had ended. Jones responded that while the harassment of a sexual nature had ceased, the general harassment continued. Rather than sexual harassment now, Jones explained "we don't speak" "[e]xcept for on a business level."

During the meeting, Fitzgerald and Westfall asked Jones to cite specific examples of harassment. After referring to "attitudes," Jones cited two examples – one occasion when Page told a fellow employee Jones did not know certain aspects of her job, and another occasion when Goosic called Jones "a liar." Jones also complained of a tense working atmosphere, bad attitudes, immature childish actions ranging "from being snotty to . . . making faces," and clerical employees being told not to talk to Jones. Fitzgerald directed Westfall to investigate Jones's written complaint. Westfall later spoke to Goosic and a clerical employee; however, no further action was taken on Jones's complaint.

Throughout the next year, Jones made no complaints of harassment. On November 3, 1995, Westfall approached Jones and inquired if she was continuing to experience sexual harassment problems with the front office personnel. Jones responded she was not, stating the front office workers avoided her and she avoided them.

In late 1995, Fitzgerald learned Goosic had embezzled funds from the sheriff's office. Goosic resigned her position and was prosecuted. Lieutenant Gary Foster (Foster) assumed Goosic's supervisory duties over the clerical personnel.

-4-

The following March 1996, Bearden officially announced his intention to oppose Fitzgerald in the November election. Jones openly supported Bearden's candidacy for sheriff and actively campaigned for him. Bearden lost the November 1996, election to Fitzgerald.

On November 20, 1996, Fitzgerald began implementing several organizational changes. Fitzgerald promoted Page, his confidential secretary, to Office Services Supervisor, a newly created position which was responsible for supervising all clerical staff within the sheriff's office. Page now reported to Foster. Foster and Jones exchanged work station locations. Jones moved from the detectives' division located in the back of the office to the front office. Jones retained the same duties, except she no longer answered the telephone for the detectives' division. Page became Jones's immediate supervisor.

Although Jones believed her involuntary transfer to be an act of political reprisal for supporting Bearden's campaign, she did not object to being supervised by Page. Initially, Jones encountered no problems working under Page. However, after the first month, Jones felt isolated and excluded from interaction with the front office personnel. Throughout 1997, Page's hostility towards Jones intensified. Page might have referred to Jones as "a crazy bitch" when talking to Goosic and, after Jones quit, Page told a prospective employer of Jones that Jones and Bearden were "birds of a feather." Despite the open hostility, Jones did not complain to her superior officers. She had "learned early on just to kind of come to terms with things and do my work, . . . just get by and pay attention to the task at hand."

Effective January 1, 1997, Sheriff Fitzgerald transferred his political opponent, Bearden, from the detectives' division to the patrol division and also transferred Deputy Terry Stark, who supported Bearden's candidacy, from the patrol division to the jail division. Later, Fitzgerald twice denied requests by Deputy Bradley Anderson, a Bearden supporter, for a transfer to the patrol division. Instead, Fitzgerald transferred Anderson to the jail division. Fitzgerald also denied

applications by James Atkinson, a Bearden supporter, for transfers to the patrol and detectives' divisions.

In August 1997, Page completed a written employee performance evaluation of Jones and rated Jones's work quality as good. Jones received high marks in job knowledge, attitude, potential, personal appearance and work station organization. She received the highest rating available for her dependability, her initiative and her adaptability. Jones had no low marks, and her lowest rating was for quantity of work output because she "[t]urns out required amount but seldom more." Page's written comments about Jones were positive. Jones considered the rating harassing because she believed her work quality was excellent and that one rating category was too low. Although she believed she deserved a higher rating, Jones did not appeal the rating, and she was not denied any employment benefits because of the rating.

In November 1997, Westfall and Page placed written memoranda in Jones's personnel file. The first memorandum written by Westfall said Jones was using a non-approved facsimile form, and Westfall directed her to discontinue use of the form until the form was approved by Sheriff Fitzgerald, explaining how to obtain that approval. Page also prepared a memo reporting on her conversation with Jones regarding the facsimile form and relating that Jones stated she would not use the form any longer. Another memorandum written by Page documented that Jones had reported an absence to a dispatcher and Page directed Jones to report absences directly to Page "so that any staffing adjustments can be made." Jones was not disciplined for either infraction and was unaware the memoranda had been placed in her personnel file until after the lawsuit was filed. Jones later testified that she considered the memoranda harassing because she believed she should have been informed of all policies and procedures upon being transferred to the new department.

Throughout the remainder of 1997 and into the Spring of 1998, Page engaged in annoying acts to Jones such as playing the radio at a volume level which made it difficult for Jones to hear when transcribing audio tapes, conversing with clerical

-6-

employees in a hushed voice, and ceasing conversations when Jones walked into the front office.  In April 1998, Page wrote a memorandum documenting Jones's resistance to a verbal reminder that Fitzgerald wanted all personnel to attend a LEADS counseling visit.  Page put the memorandum in Jones's personnel file and included Jones's statement "that she didn't think that 'he,' meaning the Sheriff[,] could make them do that."  Although Jones continued to believe Page was harassing her, she did not complain to her superiors because she "tried to just do a good job, . . . and . . . tried to get along."

On April 15, 1998, Jones was involved in an auto accident with another vehicle.  Bearden conducted the accident investigation and determined the other driver was responsible.  However, he did not cite the driver at the scene.  Following the accident, the other driver's insurer offered to pay only seventy-five percent of Jones's damages.   During a telephone call, Jones told the insurer's adjuster the insured driver would be ticketed. Two weeks after the accident, Bearden issued the driver a citation.  The insurer then filed a complaint with the sheriff's office. Fitzgerald directed Westfall to investigate the complaint.  On May 27, 1998, the Story County Attorney wrote Fitzgerald informing him that the county had moved to dismiss the traffic citation against the insured's driver based on the appearance of impropriety by the sheriff's office personnel.[2]

On April 30, 1998, Jones entered Lieutenant Foster's office to complain of the hostile working environment.  When Jones informed Foster she was tired of being harassed by Page, Foster told Jones he was unaware of a problem.  Jones lost her

---

[2]The Story County Attorney stated:

It is very important that there not be even an appearance of impropriety in the administration of justice by county employees.  It is my opinion that the circumstances surrounding the issuance of this traffic ticket and the alleged statements of the participants create such an appearance, and therefore it is appropriate for my office to dismiss this charge.

composure, uttered a profanity, and told Foster he knew of the history between Page and her. Jones then told Foster she had "better leave before [she] got fired." Jones retrieved her purse and proceeded to leave the sheriff's office.

As Jones approached the front office area, Page was assisting a civilian customer. Upon seeing a distraught Jones, Page inquired, "Vick, what is the problem?" Jones responded, "none of [your] fucking business." Jones made the statement while in uniform and in the presence of civilians and coworkers. Jones then slammed a door and left the office "because [she] knew [she] was done." Jones went home and "kicked [herself] for speaking out because [she] knew [she] had lost [her] job."

The following day Jones met with Fitzgerald in the sheriff's office, and Fitzgerald recorded the meeting. Jones asked Fitzgerald if she still had a job. Fitzgerald told her she remained employed but he was ordering internal investigations of her claim of a hostile work environment and her conduct on the prior day. Jones told Fitzgerald "I cannot work under Jane Page anymore." Fitzgerald granted Jones's request for a one-week leave of absence without pay during the investigation period.

Westfall assumed responsibility for the investigations, and she met twice with Jones in May 1998. The first meeting occurred on May 5, 1998, during Jones's leave of absence. A union steward accompanied Jones, and the meeting focused on Jones's complaints of a hostile work environment. Jones described the general harassment and informed Westfall that the hostile environment had caused her much stress and physical illness. During the meeting Jones uttered "damn," and Westfall reprimanded Jones for swearing in her office. A recess was taken and the meeting was continued.

Jones reported back to work on May 11, 1998. The next day Westfall wrote a memorandum addressed to Jones detailing the "alleged" violations of sheriff office policies and procedures by Jones. Westfall separately prepared a report for Sheriff

Fitzgerald on Jones's hostile work environment claim. The May 12, 1998, memorandum highlighted seven alleged policy violations: insubordination, general behavior, incompetence, complaints against superior, criticism, absence, and neglect.

Westfall met again with Jones on May 15, 1998. The recorded meeting focused on Jones's conduct on April 30, 1998. During the meeting Jones admitted her conduct had been improper and had resulted from her being upset by Page's attitude and actions, which she described as "[t]he silent treatment, . . . complete exclusion, [and] the cold shoulder." Jones acknowledged she had never talked with Page, her supervisor, about what Jones called hostile attitude and harassment by Page and others in the front office, and she did not do so "because it would be futile." When Westfall asked Jones why she had not filed a complaint against Page with either Foster or Fitzgerald, Jones replied "because it would have been a worthless effort," although she said Foster and Fitzgerald had "done nothing to make [her] think that."

During the week of May 11, 1998, Jones cleared out her desk because "[she] knew [she] was done." On May 19, 1998, Jones received a memorandum from Westfall informing her an insurance adjuster had filed a complaint against her relating to her April automobile accident. The memorandum stated Westfall was investigating four alleged violations of office policies and procedures and wanted to meet with Jones on May 21 to discuss the alleged violations. That evening, Jones decided to resign. She delivered her resignation letter to Fitzgerald on May 20, 1998.[3]

Jones sued Story County, Fitzgerald and Westfall alleging retaliation and constructive discharge in violation of the First Amendment.[4] The jury returned a

---

[3] At trial, Jones testified: "My resignation . . . had nothing to do with [the investigation of the ticket and insurance complaint]."

[4] Jones's complaint alleges adverse employment action in Count I and constructive discharge in Count II, both in violation of the First Amendment. The district court instructed the jury separately on "adverse employment action" and on "constructive discharge," each relating to Jones's support of the Bearden candidacy

-9-

verdict in favor of Jones. The defendants filed a post-trial motion for judgment as a matter of law or, in the alternative, for a new trial. The district court denied the motion. The defendants appeal claiming the district court erred in denying judgment as a matter of law and in failing to give the jury an instruction defining adverse employment action.

## II.   DISCUSSION
### A.    Standard of Review

We review the denial of a motion for judgment as a matter of law de novo, applying the same standard as the district court. Douglas County Bank & Trust Co. v. United Fin. Inc., 207 F.3d 473, 477 (8th Cir. 2000). When the motion seeks judgment on the ground of insufficiency of the evidence, we are presented with the legal question of whether sufficient evidence exists to support the jury's verdict. See Cross v. Cleaver II, 142 F.3d 1059, 1066 (8th Cir. 1998); Lundell Mfg. Co. v. ABC, 98 F.3d 351, 355 (8th Cir. 1996).

We must determine whether sufficient evidence was produced to support a reasonable finding on each of the elements of the plaintiff's claims. In making this determination, we must assume as proven all facts the nonmoving party's evidence tended to show, resolve all conflicts in favor of the nonmoving party, and draw all reasonable inferences in favor of the nonmoving party. Phillips v. Collings, 256 F.3d 843, 847 (8th Cir. 2001); Cross, 142 F.3d at 1066. A court should grant judgment as a matter of law when "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed. R. Civ. P. 50(a)(1).

### B.    Retaliation Claims

The parties do not dispute that Jones was exercising her right of political association in supporting Bearden's candidacy for sheriff. The right of political

---

against Fitzgerald and any retaliation in violation of the First Amendment.

association is a well established First Amendment right, for "'political belief and association constitute the core of those activities protected by the First Amendment.'" Rutan v. Republican Party of Ill., 497 U.S. 62, 69 (1990) (quoting Elrod v. Burns, 427 U.S. 347, 356 (1976)). Supporting a political candidate for elected office falls within the scope of the rights of political association.

In two political patronage cases, Elrod and Branti v. Finkel, 445 U.S. 507 (1980), the Supreme Court ruled that the "First Amendment forbids government officials to discharge or threaten to discharge public employees solely for not being supporters of the political party in power, unless party affiliation is an appropriate requirement for the position involved." Rutan, 497 U.S. at 64. A decade later, the Supreme Court in Rutan extended the rule in Elrod and Branti "to promotion, transfer, recall, and hiring decisions based on party affiliation and support." Id. at 79.[5]

In their first assignment of error, defendants claim they are entitled to judgment as a matter of law on the retaliation claim because Jones presented insufficient evidence establishing she suffered an adverse employment action. To establish a constitutional tort pursuant to 42 U.S.C. § 1983, Jones must meet two prerequisites.

---

[5]In so holding, the Court reasoned:

The same First Amendment concerns that underlay our decision in Elrod, supra, and Branti, supra, are implicated here. Employees who do not compromise their beliefs stand to lose the considerable increases in pay and job satisfaction attendant to promotions, the hours and maintenance expenses that are consumed by long daily commutes, and even their jobs if they are not rehired after a "temporary" layoff. These are significant penalties and are imposed for the exercise of rights guaranteed by the First Amendment. Unless these patronage practices are narrowly tailored to further vital government interests, we must conclude that they impermissibly encroach on First Amendment freedoms.

Id. at 74 (citations omitted).

-11-

First, she must show the county acted to inflict injury through an official proclamation or acts of the county's officers or through a pattern or custom.[6] Second, she must show a constitutional injury. Bechtel v. City of Belton, 250 F.3d 1157, 1160 (8th Cir. 2001).[7]

The defendants do not challenge the sufficiency of evidence for the first prerequisite of establishing a pattern of retaliation by Sheriff Fitzgerald against sheriff office employees who supported Bearden's candidacy. We, therefore, turn to whether Jones has proven a constitutional injury.

To prove a constitutional injury in an employment context, Jones must show she suffered an adverse employment action and "a causal connection between the protected activity and the adverse employment action." Id. at 1162. To constitute an adverse employment action, the complained of action must have an adverse impact on the employee and must effectuate "'a material change in the terms or conditions of . . . employment.'" Id. (quoting Ledergerber v. Stangler, 122 F.3d 1142, 1144 (8th Cir. 1997)); see also Harlston v. McDonnell Douglas Corp., 37 F.3d 379, 382 (8th Cir. 1994). Stated another way, "[p]roof of an adverse employment action requires a tangible change in duties or working conditions that constitute a material disadvantage." Phillips, 256 F.3d at 848 (internal citations omitted).

---

[6]The parties do not dispute that defendants Fitzgerald and Westfall, in their official capacities as Sheriff and Chief Deputy Sheriff of Story County, possessed sufficient decision-making authority for purposes of 42 U.S.C. § 1983.

[7]We note the Fifth Circuit has established a four-part test for First Amendment retaliation claims under § 1983: the plaintiff must establish "(1) she engaged in a protected activity, (2) she suffered an adverse employment action, (3) there was a causal connection between the two, and (4) the execution of a policy, custom, or practice of the [county] caused the adverse action." Sharp v. City of Houston, 164 F.3d 923, 932 (5th Cir. 1999). As discussed later, we only need to address the issue whether Jones suffered an adverse employment action.

The defendants argue the actions complained of – an involuntary transfer, negative memoranda in her personnel file, and two internal investigations – whether considered individually or collectively, are legally insufficient to constitute an adverse employment action. After a careful review of the record and case law, we agree.

### 1. Involuntary transfers.

Employment actions commonly considered serious enough to inflict constitutional injury include refusals to hire, refusals to promote, reprimands, demotions, and discharges. Rutan, 497 U.S. at 76. In employment cases, we have recognized "[t]he clear trend of authority is to hold that a purely lateral transfer, that is a transfer that does not involve a demotion in form or substance, cannot rise to the level of a materially adverse employment action." Ledergerber v. Stangler, 122 F.3d 1142, 1144 (8th Cir. 1997) (internal quotation omitted). Moreover, we have declared a transfer or reassignment which involves only minor changes in working conditions and does not involve a reduction in pay or benefits does not constitute an adverse action. Id. at 1144-45.

The evidence adduced at trial established that Jones suffered no diminution in title, position, salary, job responsibilities, benefits, hours, or other material terms or conditions. Certainly, the evidence established that, following her transfer, Jones was subjected to intensified personal animus, hostility, disrespect, and ostracism by Page and other front office personnel. However, we have consistently held a change in non-tangible working conditions, no matter how unpleasant, fails to constitute a "material employment disadvantage" necessary to establish an adverse employment actionable under either Title VII or § 1983. Manning, 127 F.3d at 692 ("hostility and personal animus from supervisors was insufficient); Ledergerber, 122 F.3d at 1144 ("loss of status and prestige with the reassignment" was insufficient); Montandon v. Farmland Indus., Inc., 116 F.3d 355, 359 (8th Cir. 1997) (forced move from Omaha, Nebraska, to Denison, Iowa, was insuffical). Jones's involuntary transfer to Page as her direct supervisor and also to interact daily with Page and others in the front office

-13-

with whom Jones had experienced a long-term adverse relationship, although offensive, does not rise to the level of a constitutional injury.

### 2.    Negative memoranda.

Similarly, the evidence established that the memoranda placed in Jones's personnel file did not adversely impact her.  Jones did not dispute the factual accuracy of the misconduct cited in the memoranda, and the defendants did not use the memoranda as the basis for any disciplinary action against Jones.  Whether Westfall may have relied on the memoranda in preparing her final investigative report is immaterial because the report was not completed until June 15, 1998, three weeks after Jones resigned.  Jones was not aware of the memoranda in her file until after she filed this lawsuit.  Therefore, the presence of negative memoranda in Jones's personnel file, without more, is not an adverse employment action. Id. at 359 (citing Meredith v. Beech Aircraft Corp., 18 F.3d 890, 896 (10th Cir. 1994)).

### 3.    Internal investigations.

Contrary to the district court's finding, we conclude the evidence clearly established that the defendants' internal investigations of Jones were warranted. Jones admitted to committing the actions underlying both misconduct investigations. As to the first investigation, Jones admitted uttering profanity in uniform on April 30,1998, first in Lieutenant Foster's office and then in the front office area in the presence of civilian customers and coworkers. Jones also acknowledged leaving duty without authorization on April 30, 1998.

As to the second investigation, Jones testified at trial that the ticket and insurance investigation did not influence her decision to resign.  Furthermore, the possibility that sheriff office employees were abusing their authority in issuing a traffic citation to increase insurance payments for a fellow employee was absolutely a proper subject for investigation.

We further conclude that Jones suffered no material disadvantage in a term or condition of employment as a result of the investigations.  Jones was not suspended

from her job during the investigations. She asked Sheriff Fitzgerald for an unpaid leave of absence, and he granted her request. During the investigations, Jones was not disciplined, nor was she threatened with discipline. Although Jones ultimately may have been disciplined, even terminated, for the alleged violations is immaterial because she resigned, thereby mooting the necessity of any disciplinary action.

### 4. **Cumulative effect**.

The plaintiff cites several Eighth Circuit decisions in support of her contention that, in determining whether the evidence adduced at trial is sufficient to find an adverse employment action, we must examine the cumulative effect of the defendants' actions of transferring Jones, papering her personnel file with negative memoranda, and launching misconduct investigations. We have recognized that a series of employment actions falling short of termination may constitute adverse employment action. See Kim v. Nash Finch Co., 123 F.3d 1046, 1060 (8th Cir. 1997). However, even analyzing this case as one of systemic retaliation, we conclude that Jones has not proved an adverse employment action.

In Kim, a discrimination and retaliation case brought under Title VII and § 1981, the defendants deprived Kim of a key job assignment, lowered his performance evaluations by thirty points, papered his employment file with negative reports that Kim alleged were fabricated, and demanded Kim undergo special remedial training. In contrast to Kim, Jones did not receive a substantial reduction in duties following her transfer. The record reflects that Jones no longer answered the telephone for the detectives' division, but there was no showing this duty was a primary duty. Jones received a comparable performance evaluation from Page as she had received previously from Bearden. Jones did not allege any fabrication or factual inaccuracies in the memoranda placed in her personnel file. Finally, Jones was not singled out to attend any special training. Although Jones objected to attending a LEADS counseling session, all sheriff office employees were required to attend one LEADS counseling session.

Without proof of a requisite adverse employment action, we conclude Jones has not established a constitutional injury. Therefore, her retaliation claim fails as a matter of law. Thus, we need not address the issue of any causal connection between the First Amendment protected political activity and any adverse employment action.

### 5. Constructive discharge.

The defendants also appeal the district court's denial of its motion for judgment as a matter of law on the plaintiff's constructive discharge claim. Jones resigned in the belief she would be terminated. We have previously ruled that a resignation is actionable under § 1983 only if it qualifies as a constructive discharge for a prohibited reason, such as political retaliation. See Irving v. Dubuque Packing Co., 689 F.2d 170, 172 (10th Cir. 1982), cited in Klein v. McGowan, 198 F.3d 705, 710 (8th Cir. 1999).

To prove constructive discharge, a plaintiff must establish the defendants deliberately made or allowed her working conditions "to become so intolerable that the employee had no other choice but to quit." Id. (quoting Irving, 689 F.2d at 172). A plaintiff must take affirmative steps short of resigning that a reasonable employee would take to make her conditions of employment more tolerable. Id.

While acknowledging the offensive environment in which Jones worked, the facts, when viewed most favorably to her, do not support the jury's findings that her working conditions had become so intolerable she had no other reasonable choice but to quit, or that she had taken steps short of resignation to improve her working conditions. Constructive discharge requires considerably more proof than an unpleasant and unprofessional environment. For seven years (long before Jones's support for Bearden's election over Fitzgerald) Jones endured disrespect, hostility, and ostracism from the front office personnel; for seventeen months before quitting Jones endured, without complaint, supervision by Page. Nothing in the record established the working environment had worsened immediately before Jones tendered her resignation. Instead, Jones's admissions establish Jones resigned because she believed she would be terminated for her misconduct: Jones's profanity

-16-

in uniform in front of civilians and supervisors, her insubordination, and leaving her duty station without authorization. The investigation on the traffic citation and the insurance payment for Jones's car was also facing Jones in the near term.

Jones had alternatives to resignation. She could have lodged a formal complaint against her supervisor and demanded relief. Jones testified she did not complain about her supervisor's conduct to the defendants or a union representative because it would have been "a worthless effort." While we recognize that situations may exist where filing a complaint with a superior officer would be perceived by a reasonable person to be a futile act, Jones has presented no such evidence. Instead, Jones's admissions establish she resigned because she believed she would be terminated for her personal misconduct.

These facts, without more, are totally insufficient to support a jury finding that a reasonable employee in Jones's position would have felt compelled to resign because her working conditions had become so intolerable. Therefore, the plaintiff's constructive discharge claim fails as a matter of law.

Because we find that the plaintiff's claims fail as a matter of law, we need not address whether the district court erred in failing to give the jury an instruction on adverse employment action.

## III.  CONCLUSION

Jones produced insufficient evidence to establish her retaliation and her constructive discharge claims under § 1983. Accordingly, we reverse the district court's order denying judgment as a matter of law and awarding attorney's fees, and we render judgment for the defendants.

A true copy.

Attest.

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.