# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-2721

_____

| | | |
|---|---|---|
| Gwenn Okruhlik, | * | |
| | * | |
| Plaintiff/Appellant, | * | |
| | * | |
| v. | * | |
| | * | |
| University of Arkansas, | * | |
| | * | |
| Defendant/Appellee, | * | Appeal from the United States |
| | * | District Court for the |
| Donald O. Pederson, in his Official | * | Western District of Arkansas. |
| Capacity; Bernard Madison, in his | * | |
| Individual and Official Capacity; Mark | * | |
| Cory, in his Individual and Official | * | |
| Capacity; Adnan Haydar, in his | * | |
| Individual and Official Capacity; | * | |
| Mounir Farah, in his Individual and | * | |
| Official Capacity; Steven Neuse, in his | * | |
| Individual and Official Capacity; | * | |
| Donald Kelley, in his Individual and | * | |
| Official Capacity; Jeff Ryan, in his | * | |
| Individual and Official Capacity; Todd | * | |
| Shields, in his Individual and Official | * | |
| Capacity; Conrad Waligorski, in his | * | |
| Individual and Official Capacity, | * | |
| | * | |
| Defendants, | * | |
| | * | |
| Randall Woods, in his Official and | * | |
| Individual Capacity, | * | |
| | * | |
| Defendant/Appellee. | * | |

_____

Submitted: April 15, 2004
Filed: January 24, 2005
_____

Before WOLLMAN, McMILLIAN, and RILEY, Circuit Judges.
_____

WOLLMAN, Circuit Judge.

Gwen Okruhlik appeals from the district court's[1] grant of judgment as a matter of law to the University of Arkansas and Randall Woods following the jury's verdict in her favor on her claims of retaliation and hostile work environment based on sexual harassment. We affirm.[2]

**I.**

We state the facts in the light most favorable to the verdict. Okruhlik was offered a tenure-track position in the political science department of the Fulbright College of Arts and Sciences at the University of Arkansas, Fayetteville, beginning in 1995. In addition, she was hired to participate in the cross-disciplinary Middle East Studies Program (the "Program"), established with a $20 million donation from Saudi Arabia to the University. Okruhlik became extensively involved in trying to develop the program, but soon experienced tension with some of the program's male faculty administrators and felt intentionally closed out of participation in its further

_____

[1]The Honorable Jimm Larry Hendren, United States District Judge for the Western District of Arkansas.

[2]We deny defendants' motion for sanctions, but express our displeasure over and our frustration with the lack of candor displayed by Appellant's counsel during oral argument. We expect, particularly in complicated, fact-intensive cases, that counsel will aid our understanding of the record, not confuse or hinder it.

development. She and three other faculty members (two women and one man)[3] expressed their concerns about the management of the program to the then dean, Bernard Madison, who initiated an investigation by a special committee. The committee developed a report that formed the basis for restructuring the program.

Okruhlik's relationship with male faculty members remained tense, both in her department and in the program. In early 1998, prior to her third-year review, an important milestone on the way to tenure-review in the sixth year, she began to overhear conversations in the office adjacent to hers, which was occupied by Steve Neuse, who became the chair of the political science department the following year. The conversations, which occurred over several months, included dirty jokes and negative comments about Okruhlik, deriding her work and expressing a desire to get rid of her. Okruhlik told only her husband about the conversations until after they had stopped. She then mentioned the conversations to Vice Chancellor for Academic Affairs, Donald Pederson, who immediately took her to the Office of Affirmative Action.

The results of Okruhlik's third-year review were mixed, but she was reappointed by Dean Madison for a fourth year. Okruhlik's emotional and psychological state deteriorated to the point that she found it necessary to take sick leave in the spring of 1999, followed by research leave for an additional year. Okruhlik filed an EEOC complaint in the fall of 1998, alleging discrimination and harassment by a number of individual professors involved in the Middle East Studies Program and her third-year review. She received a right to sue letter in April 1999, but waited to file suit until May 2000. Randal Woods had succeeded Madison as dean of Fulbright College in 1999. After Okruhlik filed the lawsuit, Woods became concerned about how Okruhlik's tenure review should be conducted and sent her a

---

[3]One of her colleagues, Linda Schilcher, is the plaintiff in a separate lawsuit in which we recently addressed questions of qualified immunity. Schilcher v. Univ. of Arkansas, 387 F.3d 959 (8th Cir. 2004).

letter detailing proposed changes in the process to ensure that the defendants named in her lawsuit would not participate. Okruhlik observed that Woods became "cold" towards her and would not help her prepare a strong tenure file, telling her that the lawsuit had changed their relationship.

Okruhlik went through the multi-layered tenure process in early 2001.[4] Okruhlik's process differed slightly from the normal review process in that a specially-formed personnel policy committee performed an independent evaluation and that all of the defendants in the lawsuit, including Neuse, then chair of the department, were precluded from voting on Okruhlik's candidacy for tenure.

_____

[4]Tenure candidates in the political science department at the University of Arkansas, Fayetteville, generally participate in the following process. Three external evaluators within the political science discipline at other institutions evaluate the candidate's credentials. Department of Political Science Personnel Document, section III(C)(2) (Department Policy); see also Fulbright College Personnel Document § V(A) (Fulbright Policy). The chair of an elected personnel policy committee (PPC) convenes a meeting with the tenured faculty in the department about the candidate and produces a report. Department Policy § III(C)(2). The department chair makes a separate written assessment, and both reports are sent to the dean. Id. If either report is negative, the candidate may withdraw or appeal for reconsideration; on reconsideration, the department chair and the faculty reassess the application, along with any additional evidence. Id. The dean then submits all materials to an elected college personnel committee (here the Fulbright Committee) which reviews the case and makes a recommendation to the dean. Fulbright Policy § V(D). The dean makes a recommendation and allows the candidate an opportunity to withdraw or appeal for reconsideration before forwarding it on to the Vice Chancellor for Academic Affairs. Id. The vice chancellor reviews the materials and makes a recommendation. See Evaluative Criteria, Procedures and General Standards, § III(B). If the vice chancellor's recommendation is negative, the candidate may request review by the Faculty Senate Committee on Appointment, Promotion and Tenure, which performs an independent evaluation and makes a recommendation to the chancellor. Id. The chancellor then makes a final recommendation to the President and the Board of Trustees. Id. The President makes the final tenure decision. Board Policy 405.1 § IV(A).

Although Okruhlik received a positive recommendation from the special personnel policy committee, she received a negative recommendation from the Fulbright Personnel Committee, and Dean Woods ultimately recommended denial of tenure. Okruhlik appealed Woods's decision, and upon reconsideration, all parties reiterated their prior conclusions. Woods forwarded his recommendation to Provost and Vice Chancellor for Academic Affairs Bob Smith, who also issued a negative recommendation, stating that "Dean Woods and the Fulbright College Personnel Committee provide compelling arguments about the modest quality and unfocused nature of your scholarship. These views are supported by the outside reviewers and made more powerful by the absence of a publishable book-length manuscript." Appellant's App. at 342. Okruhlik did not request further review upon receiving Smith's negative recommendation, so her candidacy was never considered by the chancellor or the president. Because the probationary period for a tenure-track faculty member may not extend beyond seven years, Board Policy 405.1 § IV(A)(4), Okruhlik received a terminal appointment for her seventh year at the University.

Okruhlik's lawsuit proceeded. After various pleadings and rulings, including one by this court on matters unrelated to the current claims, Okruhlik v. Univ. of Ark., 255 F.3d 615 (8th Cir. 2001) (addressing an 11th Amendment immunity issue), Okruhlik filed a second amended complaint in March 2002, alleging that her tenure process had been tainted by discriminatory animus. The district court granted the defendants' motion for summary judgment on some claims, D. Ct. Order of Oct. 2, 2002, but permitted the case to proceed to trial on the remaining claims.

At the conclusion of Okruhlik's evidence, the defendants moved for judgment as a matter of law. The district court granted the motion as to some of the defendants, but allowed the trial to proceed on the remaining claims. The district court again denied a similar motion at the close of the remaining defendants' evidence and submitted the case to the jury with specific interrogatories on Okruhlik's disparate treatment, Title VII retaliation, First Amendment retaliation, and hostile work environment claims. The jury returned a verdict for the University on the disparate

treatment claim, finding that gender was not a motivating factor in the decision not to award tenure to Okruhlik. The jury found for Okruhlik and against the University and Woods on the retaliation and hostile work environment claims, however, and awarded damages totalling $353,000. It made the following findings by a preponderance of the evidence in response to interrogatories presented by the court:

> . . . that the University of Arkansas made a decision not to award Dr. Okruhlik promotion and tenure and that the fact that Dr. Okruhlik engaged in statutorily-protected activity was a motivating factor in that decision.

> . . . that Dean Randall Woods took adverse employment action against Dr. Okruhlik because she made statements critical of the administration of the Middle East Studies program or because she filed this lawsuit.

Appellant's App. at 62-68.

The University and Woods once again moved for judgment as a matter of law on all claims. The district court granted the motion, finding that one of the elements of the retaliation claims could not be met because Okruhlik was never officially denied tenure by the University; she had not completed all the levels of the tenure review process and did not receive a final decision by the University's president. The district court found that the completion of the process was "necessary in order to reach the point of an 'adverse employment action' which would support an employment discrimination claim." D.Ct. Order of May 27, 2003, at 7. Okruhlik therefore received a terminal appointment by operation of the policy because her probationary period had expired.

## II.

We review de novo the district court's decision to grant a motion for judgment as a matter of law. Walsh v. Nat'l Computer Sys., 332 F.3d 1150, 1158 (8th Cir. 2003). We "draw all reasonable inferences in favor of the nonmoving party, and [ ]

may not make credibility determinations or weigh the evidence." Kipp v. Mo. Highway & Transportation Comm'n, 280 F.3d 893, 896 (8th Cir. 2002) (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000)). Judgment as a matter of law is appropriate "when all the evidence points one way and is susceptible of no reasonable inferences sustaining the position of the nonmoving party." Mouser v. Caterpillar, Inc., 336 F.3d 656, 662 (8th Cir. 2003) (citation omitted). An inference is reasonable if it "may be drawn from the evidence without resort to speculation." McGreevy v. Daktronics, Inc., 156 F.3d 837, 840-41 (8th Cir. 1998) (citation omitted). The court may not substitute its own judgment for that of the jury, but it may, in considering the whole record, give credence to the moving party's "uncontradicted and unimpeached [evidence], at least to the extent that that evidence comes from disinterested witnesses." Kinserlow v. CMI Corp., Bid-Well Div., 217 F.3d 1021, 1025 (8th Cir. 2000) (citing Reeves, 530 U.S. at 151).

## A.

Okruhlik contends that the district court erred in overturning the jury verdict in her favor on her Title VII and First Amendment retaliation claims. The substance of both claims is virtually identical, but they rest on different legal grounds inasmuch as Title VII may serve as a basis for suit only against the University, whereas Okruhlik's First Amendment claim was brought under 42 U.S.C. § 1983 against Woods in his individual capacity. See Lenhardt v. Basic Inst. of Technology, 55 F.3d 377, 381 (8th Cir. 1995) (stating that Title VII "liability for unlawful discrimination in the workplace [is] imposed only on the employing entity"). To state a retaliation claim, consisting of the same elements under Title VII and the First Amendment, a plaintiff must prove that: (1) she engaged in a protected activity; (2) that the employer took an adverse employment action against her, and (3) that the two situations are causally connected. Kipp, 280 F.3d at 896 (Title VII); Duffy v. McPhillips, 276 F.3d 988, 991 (8th Cir. 2002) (First Amendment).

Defendants argue that the district court correctly found that Okruhlik could not have established a prima facie retaliation case because she did not suffer an adverse

employment action. Okruhlik argues that Dean Woods's recommendation in fact resulted in her failure to achieve tenure and that further internal appeals beyond the vice chancellor would have been futile. She contends that the policy operating to issue her a terminal appointment when she declined to appeal the vice-chancellor's negative recommendation constitutes an adverse employment action.[5]

We are mindful of the singular nature of academic decision-making, and we lack the expertise to evaluate tenure decisions or to pass on the merits of a candidate's scholarship. We have said that "[w]hile Title VII unquestionably applies to tenure decisions, judicial review of such decisions is limited to whether the tenure decision was based on a prohibited factor." Brousard-Norcross v. Augustana College Assoc., 935 F.2d 974, 976 (8th Cir. 1991). The Supreme Court has made it clear that "[w]hen judges are asked to review the substance of a genuinely academic decision, . . . they should show great respect for the faculty's professional judgment." Regents of Univ.

---

[5]Okruhlik also argues that the district court's grant of judgment as a matter of law was procedurally flawed because the defendants failed to specify in their pre-verdict motion the grounds that they later argued in their post-trial motion. See Fed. R. Civ. P. 50(b). We disagree. Although it is true that a post-trial motion for judgment as a matter of law may not raise additional grounds that the party did not raise in a pre-verdict motion, Walsh, 332 F.3d at 1158, the grounds are considered to be sufficiently raised if the district court and the nonmoving party are apprised of the basis for the motion. Lawrence v. CNF Transp., Inc., 340 F.3d 486, 491 n.2 (8th Cir. 2003). Technical precision in stating the grounds for the motion is not necessary. Jarvis v. Sauer Sundstrand Co., 116 F.3d 321, 323 n.4 (8th Cir. 1997).

In this case, the defendants raised challenges to all the claims at issue here pre-verdict, both after Okruhlik's evidence and after their evidence. The defendants discussed the issue of adverse employment action and the district court was aware that they were questioning both the existence of an adverse employment action and the existence of causation on the retaliation claims. In their final pre-verdict motion, the defendants reiterated the same arguments. Immediately after the verdict was entered, the defendants stated that they intended to submit both judgment-as-a-matter-of-law and Rule 59 motions, and then proceeded to do so. Accordingly, we conclude that the relevant grounds were sufficiently preserved.

of Mich. v. Ewing, 474 U.S. 214, 225 (1985) (footnote omitted); see also Board of Curators, Univ. of Mo. v. Horowitz, 435 U.S. 78, 90 (1978).

A plaintiff suffers an adverse employment action when the action results in a "material employment disadvantage" such as "'[t]ermination, reduction in pay or benefits, and changes in employment that significantly affect an employee's future career prospects.'" Duncan v. Delta Consol. Indus., 371 F.3d 1020, 1026 (8th Cir. 2004) (quoting Spears v. Mo. Dep't of Corrs. & Human Res., 210 F.3d 850, 853 (8th Cir. 2000)). An official denial of tenure is an adverse employment action for purposes of evaluating a retaliation claim. See, e.g., Abramson v. William Patterson Coll., 260 F.3d 265, 288 (3d Cir. 2001). The academic setting and complex nature of tenure decisions, however, distinguishes them from employment decisions generally. See Dobbs-Weinstein v. Vanderbilt University, 185 F.3d 542, 545 (6th Cir. 1999). We adopt these principles and believe it is appropriate for us to defer to campus policy in determining when an official decision on tenure has been made, particularly in light of the many intermediate recommendations involved in the process. See id. at 545-46. We do not want to turn the tenure process into potentially endless litigation over each intermediate step, and believe that a university should have the opportunity to correct errors through its complete internal appeals process that precedes its final decision. See id. at 546. "[W]here the tenure decision was following the chain of appeal, each decision along the way is not actionable. Only the final decision is the ultimate act." Howze v. Virginia Polytechnic Inst. and State Univ., 901 F. Supp. 1091, 1097 (W.D. Va. 1995).

A candidate may only challenge the entire process once she has utilized the prescribed process of tenure review and obtained a final university decision. At that point, a negative evaluation that became part of an employee's file, although it does not itself constitute an adverse employment action, see Jones v. Fitzgerald, 285 F.3d 705, 714 (8th Cir. 2002), may be sufficient to show discrimination or retaliation if it served as the basis for the adverse employment action. Intermediate decisions in a promotion process are similar; they do not constitute independent adverse

employment actions unless they directly influence the decision-maker's choice to terminate the individual's employment. See Abramson, 260 F.3d at 286. A jury may reasonably "conclude that an evaluation at any level, if based on discrimination, influenced the decisionmaking process and thus allowed discrimination to infect the ultimate decision." Id. (quoting Roebuck v. Drexel Univ., 852 F.2d 715, 727 (3d Cir. 1988)). The jury may not even consider that evidence and no recovery is possible, however, if there is not an ultimate decision to review.

In contrast to Abramson, where the college's president and the Board of Trustees officially denied Abramson tenure according to the school's policies, see Abramson, 260 F.3d at 268, 272, here the president never reviewed Okruhlik's candidacy because Okruhlik declined to seek review of the vice chancellor's negative recommendation. The University of Arkansas policy establishes that a final decision on tenure has not been made until the president has issued his decision. This conclusion does not automatically apply to all tenure cases and we will take a case-by-case approach, looking at the specifics of each school's policies. In this case, the president is the only official authorized to grant tenure.[6] The president, however, "*will not consider* awarding tenure to a faculty member in a probationary status without the prior recommendation of the faculty member's departmental faculty, chairperson, dean, chief academic officer, and the chief executive officer of the campus concerned." Board Policy 405.1 § IV(A)(7) (emphasis added).

A faculty candidate at the University of Arkansas, therefore, must ensure that the president receives all of the requisite recommendations in order to be officially considered for tenure. If the recommendations below are positive, the policy dictates

---

[6]In defining "tenure," Board Policy 405.1 § I states that "[t]enure is the right of continuous appointment. It is awarded by the President to eligible members of the faculty upon successful completion by each of a probationary period." The policy clearly differentiates tenure from other employment decisions, such as reappointment for non-tenured faculty members, for which the final decision is made by the dean and the vice chancellor for academic affairs. Board Policy 405.1 § IV(B).

that they will automatically proceed to the next level; if they are negative, the candidate must in several instances affirmatively seek further review by requesting reconsideration of the recommendation. For example, if the candidate receives a negative recommendation from the personnel policy committee chair or the department chair, she "may request that the tenure application be terminated" or may appeal for reconsideration, after which the recommendation is transmitted to the dean. See Department Policy § III(c)(2)(b). In addition, as occurred in this case, if the candidate receives a negative recommendation from the vice chancellor, she may either choose not to seek further review or may request review by the University's Faculty Senate Committee on Appointment, Promotion and Tenure, which would perform an independent evaluation of her tenure file, including all the prior recommendations, and would make a recommendation to the chancellor. See Evaluative Criteria, Procedures and General Standards § III(B).

Because Okruhlik failed to pursue the additional levels of review available to her after she received the negative recommendation from the vice chancellor, A.A. 342, we do not know whether the president would have decided to award tenure. We conclude that Okruhlik's decision not to appeal the vice chancellor's recommendation therefore served as a withdrawal from the tenure-review process. She did receive a terminal contract for her seventh year at the University, but that was due to the operation of the clearly established term of employment for tenure-track professors that the probationary period for such positions may not to extend beyond seven years. Board Policy 405.1 § IV(A)(4). Okruhlik did not suffer an adverse employment action for purposes of her complaint in this case, and thus we affirm the district court's grant of judgment as a matter of law on the retaliation claims.

**B.**

Okruhlik also contends that the district court erred in overturning the jury verdict in her favor on her hostile work environment sexual harassment claim. She alleges that she suffered harassment in both the Middle East Studies Program and the Political Science department. She presented evidence that she was marginalized from

-11-

decision-making in the program and that several men in her department participated in conversations in the office next to hers that ranged from negative and offensive statements about her to crude statements generally. To establish a prima facie case for a hostile work environment based on sexual harassment, Okruhlik must show (1) that she belongs to a protected group; (2) that she was subjected to unwelcome sexual harassment; (3) that the harassment was based on sex; and (4) that the harassment affected a term, condition or privilege of her employment. Henthorn v. Capitol Communications, Inc., 359 F.3d 1021, 1026 (8th Cir. 2004).

The University properly preserved a challenge to the hostile work environment claim on the applicability of the affirmative defense established in Faragher v. Boca Raton, 524 U.S. 775 (1998), and Burlington Industries, Inc. v. Ellerth, 524 U.S. 742 (1998). If no tangible employment action for which an employer may be held strictly liable has occurred, the employer is liable for sexual harassment by its employees only "if it knew or should have known about the conduct and failed to stop it." Ellerth, 524 U.S. at 759; see also Faragher, 524 U.S. at 807. A defendant may therefore assert the defense by proving the following two elements: "(1) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (2) that the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise." Pa. State Police v. Suders, 124 S. Ct. 2342, 2349 (2004). The defendant bears the burden of showing that the victim unreasonably failed to take available steps to reduce the harm. Id. at 2354.

Although Okruhlik experienced conflict with several of her colleagues, the University responded to Okruhlik's harassment concerns as soon as they came to light. Most of Okruhlik's conflicts with her colleagues appear to have involved disagreements over the management of academic programs. When Okruhlik went to see Dean Madison about mismanagement in the Middle East Studies Program, he responded with concern, and initiated an investigation that resulted in a restructuring of the program. The heart of Okruhlik's harassment claim, however, related to the

conversations she overheard from the adjacent office that consisted of negative and even conspiratorial references to her work and job.  Although the University maintains an Office of Affirmative Action (OAA), where Okruhlik could have initiated a grievance procedure to put the University on notice of the alleged harassment, she failed to do so, choosing instead not to inform anyone at the University of the conversations until after they had ended.  The conversations ceased in April 1998, and it was not until the next month that Okruhlik complained to Vice-Chancellor Pederson, who then personally accompanied Okruhlik to the OAA and arranged for her to meet with the assistant director of that office. In light of these facts, we conclude that the University was entitled to the benefit of its affirmative defense, and we thus affirm the district court's grant of judgment as a matter of law on the hostile work environment claim.

The judgment is affirmed.

_____